## In Re METLIFE DEMUTUALIZATION LITIGATION.

### No. 00–CV–2258 (TCP).

United States District Court, E.D. New York.

May 27, 2009.

Jared B. Stamell, John C. Crow, Stamell & Schager, LLP, New York, NY, David Scott Mandel, Mandel & Mandel LLP, Miami, FL, for Plaintiffs.

Bruce E. Yannett, Carl Micarelli, Eric Daniel Meyer, Debevoise & Plimpton LLP,

Duncan J. Logan, Metropolitan Life Insurance Co., New York, NY, for Defendants.

Barry A. Weprin, Milberg LLP, New York, NY, for Respondents.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Before the Court is Defendant MetLife's motion for summary judgment or in the alternative partial summary judgment. Also before the Court is Plaintiffs' motion for summary judgment. For the reasons described below, MetLife's motion for summary judgment and Plaintiffs' motion for summary judgment are DENIED.

The undersigned assumes familiarity with this Court's earlier decision denying MetLife's initial motion to dismiss Plaintiffs' original complaint in this case filed under Section 12(a) of the Securities Act of 1933 in *In Re: MetLife Demutualization Litig.*, 156 F.Supp.2d 254 (E.D.N.Y.2001) and with the Statement of Facts set forth therein, and in *In Re: MetLife Demutualization Litig.*, 322 F.Supp.2d 267 (E.D.N.Y.2004).

## BACKGROUND

This case is a securities class action against Metropolitan Life Insurance Company and MetLife, Inc., ("MetLife") with respect to MetLife's conversion from a mutual life insurance company to a stock life insurance company by a process known as demutualization. The plaintiff class ("Plaintiffs") allege that MetLife omitted material information from a prospectus sent to MetLife policyholders in connection with the demutualization. Various aspects of the underlying facts have been recounted in prior Court orders: *In re MetLife Demutualization Litig.*, 156 F.Supp.2d 254

(E.D.N.Y.2001), *In re MetLife Demutualization Litig.*, 322 F.Supp.2d 267 (E.D.N.Y. 2004) and *In re MetLife Demutualization Litig.*, 495 F.Supp.2d. 310 (E.D.N.Y.2007). Because of the lengthy material facts and supporting evidence presented by the parties in the present motion for summary judgment, it is (reluctantly) necessary to include a detailed account of both the disputed and undisputed facts at issue as presented by the parties. The ultimate question is whether the Plaintiffs have alleged sufficient facts to show that there remain genuine issues of material facts.

*Development and Review of the Plan of Reorganization*

Defendants Metropolitan Life Insurance Company (the "Company") and MetLife, Inc. have been, since the Company's founding in 1866, a life insurance company incorporated and existing under the laws of New York State. *Def's Statement of Material Fact at ¶ 1.*[1]

On November 24, 1998, the Company's Board of Directors (the "Board") authorized the development of a reorganization plan to change the Company's corporate form from a mutual life insurance company to a stock life insurance company. *Id.* at ¶ 2.

During the development of a proposed plan of reorganization, Company personnel "worked with" outside legal, actuarial, and investment banking advisors, the New York Insurance Department ("Department") and the Department's external legal, actuarial, and financial consultants. *Def's Statement of Material Fact at ¶ 3; Ex. 32 at 37:19–25, 83:8–20, 156:4–11; Ex. 33 at 152:5–9, 207:7–25, 209:9–210:2; Ex. 20 at 178:12–21, 226:21–227:4; Ex. 21 at 13:1–15:13, 56:18–25; Ex. 23 at 271:21–*

---

1. Citations to "Def's Statement of Material Fact" refer to the Defendant's Statement of Material Fact.

272:22.[2] Although Plaintiffs dispute the characterizations "worked with" and "to develop," *Pl.'s Response at ¶ 3*,[3] Plaintiffs do not assert that their disagreement involves an issue of material fact and do not cite any evidence demonstrating a genuine issue of material fact with respect to MetLife's characterizations. *Def.'s Reply at 2*.[4]

The Department was assisted in its review of the demutualization by its outside consultants, which included its legal consultant Fried, Harris, Shriver and Jacobon (*Ex. 35 at 501:12–13*); its financial consultant The Blackstone Group (*Ex. 33 at 208:13–16*); and its actuarial consultant Milliman & Robertson, Inc. (*Ex. 32 at 158:5–12*). *Def.'s Statement of Material Fact at ¶ 4*. Plaintiffs dispute the characterization "was assisted in its review," *Pl.'s Response at ¶ 4*, but do not cite any evidence as this question.

The Department, with its outside consultants, reviewed multiple drafts of the Plan of Reorganization, the Policyholder Trust Agreement, Policyholder Booklet Parts One and Two, actuarial documents and other related materials. *Def's Statement of Material Fact at ¶ 5; Ex. 21 at 6:15–7:10, 13:1–15:13, 27:11–18, 52:14–21; Ex. 35 at 500:14–501:16, 567:22–568:2; Ex. 34 at 9:8–23, 21:12–16; 23:25–24:12*. Plaintiffs dispute the characterization "reviewed," *Pl.'s Response at ¶ 5*. All these documents, however, were the subject of meetings and discussions between the Department and its consultants and the Company and its advisors, as well as any other issues arising out of the demutualization. *Def.'s Statement of Material Fact ¶ 6, 7; Ex. 32*

at 37:18–38:6, 59:24–61:17; Ex. 21 at 52:14–21, 54:8–16; Ex. 19 at 198:1–18.

The Company and its advisors submitted additional documents addressing issues regarding the Plan of Reorganization at the request of the Department and its consultants or upon its own initiative. *Id. at ¶ 8; Ex. 34 at 23:14–25, 216:9–20, 217:6–12; Ex. 27 at 440:19–441:3–6; Ex. 17 at 53:2–8*. Plaintiffs contend that the meetings and discussions concerned only the documents described in paragraph 5, (the Plan of Reorganization, the Policyholder Trust Agreement, Policyholder Booklet Parts One and Two, actuarial documents and other related materials), and that the only materials submitted to the Department were the documents described in paragraph 5. *Pl.'s Response at ¶ 7, 8*.

However, in addition to the materials described in paragraph 5, numerous other issues were the subject of meetings and discussions between the Company and the Department. *Def.'s Reply at 2. E.g., Ex. 19 at 198:1–9 (Goldman Sachs spoke to Insurance Department "with respect to the status of the IPO and bringing [the Department] up to speed on a very regular basis"); Ex. 21 at 52:14–21 ("[T]he insurance department clearly interacted with its outside advisors, on both parts of the policy holder information booklet, including all the contents as well as certain other materials."); see also Ex. 52 ¶ 17*. The evidence also shows additional documents, aside from those referenced in paragraph 5 were submitted to the Department. *Def.'s Reply at 3. Ex. 34 at 23:14–25, 216:9–20, 217:6–12; Ex. 27 at*

---

**2.** Citations to "Ex." refer to exhibits to the Declaration of Carl Micarelli dated April 4, 2008.

**3.** Citations to "Pl.'s Response" refer to the Plaintiff's Response to Defendant's Statement of Material Fact.

**4.** Citations to "Def's Reply" refer to Defendant's Reply to Plaintiff's Response to Defendant's Statement of Material Fact.

440:19–441:9; Ex. 17 at 53:2–8; see also Ex. 52 ¶ 17.

*Adoption of the Plan of Reorganization by the Board of Directors*

On September 28, 1999, the Board adopted a Plan of Reorganization (the "Plan"). Def's Statement of Material Fact at ¶ 9; Exs. 7, 12–14; see Ex. 8; Ex. 33 at 88:4–6; Ex. 29 at 199:16–200:2. On November 3 and 16, 1999, and March 9, 2000, the Board amended the Plan. Def.'s Statement of Material Facts at ¶ 10; Exs. 9, 10, 11. In adopting the Plan and its amendments, the Board determined that the Plan was fair and equitable to policyholders and in the best interest of the Company and its policyholders. Def.'s Statement of Material Facts at ¶ 14. Exs. 8, 9, 10, 11.

According to the terms of the Plan, each owner of a policy that was in force on September 28, 1999, was an "Eligible Policyholder" who was entitled to vote on the proposed Plan and, upon the Plan's approval, to receive consideration upon demutualization. Def.'s Statement of Facts at ¶ 15; Ex. 7 Art. II, §§ 5.2(a), 5.2(d)(iii), 5.6(b). Between November 24 and December 21, 1999, the Company mailed to Eligible Policyholders a package that included the following items: (a) A cover letter from the Company's chairman; (b) A booklet titled "Read Me First"; (c) A two-part Policyholder Information Booklet; (d) A ballot and return envelope for voting on the Plan; (e) A card listing the policyholders' policies for which the policyholder was eligible to receive consideration under the Plan and indicating the form in which consideration was to be received; (f) Except for policyholders with addresses in Canada, an Internal Revenue Service Form W–9 to report the policyholder's social security number; and (g) Except for policyholders with addresses in Canada, a card that allowed policyholders eligible to receive consideration in the form of stock

to elect to receive cash instead of stock. Exs. 1–5; see Ex. 49; Ex. 26 at 128:14–17, 272:6–11, 273:15–22; Ex. 40 at 105:10–13, 22–24; Ex. 34 at 52:12–17; Ex. 42 at 24:20–25, 36:11–18, 48:15, 57:19–58:9. The package was sent to all or substantially all Eligible Policyholders with valid addresses. Def.'s Statement of Material Fact at ¶ 18. Those with no known valid addresses received a notice, in the form of a letter informing them on how to obtain a full package. Id.; Ex. 49; Ex. 42 at 53:5–10.

*Mailing to Policyholders and Policyholder Vote*

Prior to mailing, all of the materials sent to Policyholders were reviewed and commented upon by the New York State Department of Insurance and its advisors and were approved by the Superintendent of Insurance of the State of New York ("Superintendent"). Def.'s Statement of Material Fact at ¶ 19; Ex. 32 at 61:23–62:13; Ex. 34 at 9:8–9:23, 18:4–18:10, 20:18–22:5, 24:7–12, 49:19–50:4. Plaintiffs dispute MetLife's characterization and theorize that the Department only reviewed summaries of the Plan. Pl.'s Response at ¶ 19; Def. Ex. 3 at 9.

MetLife asserts that Plaintiffs have misstated the evidence by implying that the only materials approved by the Superintendent were the summaries of the Exhibits and Schedules to the Plan. Def.'s Response at 3. MetLife asserts that under applicable New York Law, it was required to obtain the Superintendent's approval of not only the summaries but all explanatory materials sent to policyholders. Id.; See N.Y. Ins. Law § 7312(i), (k)(1); Ex. 52 ¶ 216 ("[t]he policyholder notices and accompanying documents, including the Policyholder Information Booklets, Parts One and Two . . . were approved by the Superintendent pursuant to Section 7312(i), (k)(1),"). Plaintiffs have failed to raise a

genuine issue of material fact as to this issue.

On February 7, 2000, the policyholder vote was completed. *Def.'s Statement of Material Fact at ¶ 20; Ex. 51 at 1.* Approximately 93.16% or, 2,572,832 of the 2,761,746 eligible policyholders, voted in favor of the demutualization. *Def.'s Statement of Material Fact at ¶ 21; Ex. 51 at 2.*

*Superintendent's Approval of the Plan*

On January 24, 2000, the Superintendent conducted a public hearing. *Id. at ¶ 22; Decl. ¶ 54.*[5] On April 4, 2000, the Superintendent issued an Opinion and Decision approving the Plan, *Id. at ¶ 23; Ex. 52,* which stated that "the proposed reorganization, in whole and in part, does not violate applicable law, is fair and equitable to the policyholders, and is not detrimental to the public, and, after giving effect to the reorganization, the reorganized issuer will have an amount of capital and surplus reasonably necessary for its future solvency." *Def.'s Statement of Material Fact at ¶ 24; Ex. 52 ¶ 238.* The Opinion and Decision also stated that the disclosure materials "contained sufficient information about the proposed reorganization to enable Eligible Policyholders to make an informed decision regarding the Plan." *Id. at ¶ 25; Ex. 52 ¶ 216.*

Plaintiffs do not dispute that the Opinion and Decision contain this language, but instead allege that "the vote on reorganization violated applicable law and injured participating policyholders," *Pl.'s Response at ¶ 24; Plaintiffs' Second Amended Complaint,* and that the disclosure materials prevented policyholders from making an informed decision by omitting material information regarding the proposed reorganization. *Id. at ¶ 25.* In response, MetLife argues that Plaintiffs cannot rely on the conclusory allegations in the Second

Amended Complaint to raise a genuine issue of material fact, and have thus failed to do so. *Def.'s Reply at 1, ¶ B.*

*Effect of the Plan*

According to the terms of the Plan, its effective date was the date that MetLife completed an initial public offering ("IPO") of its common stock. *Def.'s Statement of Material Fact at ¶ 26; Ex. 7 § 5.2(b).* The IPO was completed, and the Plan became effective on April 7, 2000, completing demutualization, *Id. at ¶ 27; Ex. 33 at 25:22–26:12; Ex. 54; see also N.Y. Ins. Law § 7312(1),* at which time the Company ceased to be a mutual life insurance company and became a stock life insurance company as a wholly owned subsidiary of MetLife, Inc. *Id. at ¶ 28; Ex. 7 §§ 5. 1, 5.2(e), (f).*

MetLife states that the demutualization did not alter the contractual rights or obligations of any policy, other than any right to vote that may have been contained in such policy. *Def.'s Statement of Material Fact at ¶ 29; Ex. 7 Art. II, Policyholders' Membership Interests, § 3.1(b), (c); see also Ex. 20 at 100:19–101:15; Ex. 38 at 21:4–18.* Plaintiffs assert that the demutualization altered the rights of policyholders and obligations of the MetLife, under N.Y. Ins. Law § 3203, which provides that a life insurance policy shall contain a provision mandating an insurer to ascertain and apportion any divisible surplus accruing on the policy. *Pl.'s Response at ¶ 29; Ex 7 Art. II, Policyholders' Membership Interests, § 3.1(b), (c); see also Ex. 20 at 100:19–101:15; Ex. 38 at 21:4–18.* However, § 3203 requires that certain provisions be included in "[a]ll life insurance policies ... delivered or issued for delivery in this state." N.Y. Ins. Law § 3203. Since § 3203 makes no distinction between stock and mutual companies, as a matter of law

---

**5.** Citations to "Decl." refer to the Declaration of Carl Micarelli dated April 4, 2008.

it continues to apply to MetLife after demutualization. *Def.'s Response at 5.* Furthermore, Plaintiffs does not point to any evidence showing that the Plan removed such provisions from policyholders' insurance policies. *Def.'s Response at 5, ¶¶ (3).* Both the Plan and applicable New York Insurance Law expressly preserve all insurance policy provisions other than those conferring a right to vote. *See N.Y. Ins. Law § 7312(a)(3), (r); Ex. 7 Art. II, Policyholders' Membership Interests; ·id. § 3.1(b)-(c).*

MetLife states that the demutualization did not alter any policy's eligibility for dividends as declared by the Company's Board. *Ex. 7 Art. II, § 3.1(b), (c); see also Ex. 20 at 100:4–101:15; Ex. 38 at 21:4–18.* Plaintiffs assert that such rights were altered pursuant to § 3203 and § 4231 of N.Y. Ins. Law. *Harwood 4/6/06 Tr. at 98:9–99:18, 33:24–34:21, 45:19–47:2; Ex. 35; Dunham 3/26/08 Tr. at 204:15–209:9; Ex. 14.* However, § 4231 requires "every domestic life insurance company" to make annual dividend determinations, and as a matter of law, it continues to apply to MetLife after demutualization. *N.Y. Ins. Law § 4231; see also Ex. 84 at 91:20–92:23; Ex. 86 at 32:15–33:11; Ex. 87 at 107:16–108:2; Ex. 83 at 20:23–21:13.*

MetLife states that participating polices prior to demutualization remained participating policies subsequent to demutualization. *Def.'s Statement of Fact at ¶ 31.* Plaintiffs dispute this and assert that participating policyholders' rights to participate in dividends under N.Y. Ins. Law § 3203 and § 4231 were altered and restricted. *Harwood 4/6/06 Tr. at 98:9–99:18, 33:24–34:21, 45:19–47:2; Ex. 35; Dunham 3/26/08 Tr. at 204:15–209:9; Ex. 14.* However, Plaintiffs as a matter of law possessed no "rights" in dividends other than to receive them *if* they were declared by the Company's Board of Directors.

*Def.'s Reply at 5, ¶¶ (4); Ex. 48 ¶¶ 6, 7(e)-(f); Ex. 20 at 101:4–15; Ex. 83 at 85:7–15.* In the event that Plaintiffs' insurance policies contained any greater rights, such rights would have been expressly preserved by the Plan and as a matter of law by New York statute. *Def.'s Reply at 5, ¶¶ (4); See N.Y. Ins. Law § 7312(a)(3), (r); Ex. 7 Art. II, Policyholders' Membership Interests, § 3.1(b)-(c).*

*Policyholders' Membership Interests*

Policyholders' membership interests were extinguished by operation of the Plan on the effective date of the Plan. *Def.'s Statement of Material Fact at ¶ 32; Ex. 7 § 3.1(c).* Eligible Policyholders, by the terms of the Plan, were entitled to receive consideration in exchange for their membership interests. *Id. at ¶ 33; Ex. 7 §§ 3.1(c), 5.2(d)(iii), 5.2(e)(ii)-(iv), 7.1(a).*

State law required MetLife to mail to the policyholders prior to the vote a notice "accompanied by a true and complete copy of the plan, or by a summary thereof approved by the superintendent, and such other explanatory information as the superintendent shall approve or require." N.Y. Ins. Law § 7312(k)(1). These materials (collectively "PIB" or "the Prospectus") stated:

> As an owner of a MetLife Policy, you have certain rights as a "member" of the company because MetLife is a mutual insurance company. These rights will no longer exist if the Plan becomes effective. However, if you are an Eligible Policyholder, you will receive compensation in exchange for these rights.

*Def.'s Statement of Material Fact at ¶ 34; Ex. 1 at 8.* The PIB also stated that upon approval of the demutualization, policyholders "will no longer have any Policyholders' Membership Interest in MetLife." *Def.'s Statement of Material Fact at ¶ 35; Ex. 1 at 13.* The Plan defines "Policyholders' Membership Interests" as follows:

"Policyholders' Membership Interests" means all policyholders' rights as members arising prior to the Reorganization under the charter of the Company or otherwise by law. These include the right to vote and to participate in any distribution of surplus in the event that the Company is liquidated. The term "Policyholders' Membership Interests" does not include rights expressly conferred upon the policyholders by their policies or contracts (other than any right to vote), such as the right to any declared policy dividends. All Policyholders' Membership Interests will be extinguished on the Plan Effective Date. *Def.'s Statement of Material Fact at ¶ 36; Ex. 7 Art. II.*

Immediately prior to the demutualization, The Company's Charter contained a provision conferring the right to vote in elections for directors of the company on each policyholder. *Def.'s Statement of Material Fact at ¶ 37. Ex. 55 Art. V, § 1.* Among the "membership interests" that were terminated upon approval and operation of the Plan was the policyholders' right to vote. *Id. at ¶ 38; Ex. 20 at 61:24–62:7; Ex. 37 at 19:14–22.*

MetLife distinguishes the policyholders' "membership interests" from their contractual dividend rights and states that, other than their right to vote, policyholders' "membership interests" did not include any rights expressly conferred by either their policies or contracts. *Def.'s Statement of Material Fact at ¶ 39; Ex. 7 Art. II, Policyholders' Membership Interests.* Plaintiffs assert that the interests also include statutorily required provisions pursuant to New York Insurance Law § 3203. *Pl.'s Response at ¶ 39; N.Y. Ins. Law § 3203, 7312.* In further distinguishing policyholders' contractual rights from their "membership interests," MetLife states that "membership interests" did not include any rights expressly conferred, either through policies or contracts, to any declared dividends. *Def.'s Statement of Material Fact at ¶ 40; Ex. 7 Art. II, Policyholders' Membership Interests.* Plaintiffs assert that § 3203 of the New York Insurance Law requires a policy to include the contractual right to dividends and such right is necessarily included in "membership rights" as defined by MetLife. *Pl.'s Response at ¶ 40.* The PIB provided a description of interests that, upon demutualization, would be extinguished:

> *As an owner of a MetLife Policy, you have certain rights as a "member" of the company because MetLife is a mutual life insurance company. For the purposes of the demutualization these rights are referred to as "Policyholders' Membership Interests," and they consist primarily of:*
>
> *The right to vote on matters submitted to policyholders for a vote, including the election of directors.*
>
> *The right to receive a portion of any remaining surplus (total assets minus total liabilities) if the company is liquidated.*
>
> *These rights will no longer exist if the Plan becomes effective. However, if you are an Eligible Policyholder, you will receive compensation for relinquishing these rights.*

*Def.'s Statement of Material Fact at ¶ 41; Ex. 1 at 16.*

Plaintiffs do not contest the language quoted by MetLife, but instead dispute MetLife's definition of "interests," asserting that policyholders' "primary rights" must also include a right to all earnings and surpluses accruing on a policy, which is omitted. *Pl's Response at ¶ 40; See N.Y. Ins. Law § 4231.*

MetLife argues that Plaintiffs' distinction between a contractual right to divi-

dends and "membership interests" consisting of the right to vote, is based on a misreading of applicable New York law and do not raise a genuine issue of material fact, but instead a legal dispute. *Def.'s Reply at 6–7*. MetLife asserts that, as a matter of law and by the plain terms of the Plan, policyholders' "membership interests" are separate and distinct from contractual rights contained in a policy, including a right to receipt of dividends as declared by the Board. *Def.'s Reply at 6–7*; Ex. 7 Art. II, *Policyholders' Membership Interests*. MetLife states that the Plan has no effect on the continued applicability of New York Insurance Law § 3203 or § 4231 to MetLife and also does not affect any provisions required by § 3203 in class members' policies. *Def.'s Reply ay 7; See Def.'s Statement of Material Fact ¶ 29–31*.

MetLife further defines policyholders' membership interests in the Company when it was a mutual life insurance company as "illiquid and restricted interests." *Def.'s Statement of Material Fact at ¶ 42*; Ex. 24 at 320:11–22; Ex. 34 at 159:16–160:6. Additionally, the policyholders' membership interests in the Company, prior to demutualization, were not transferable separately from the policies that gave rise to them. *Def.'s Statement of Material Fact at ¶ 43*; Ex. 18 at 243:2–9; Ex. 34 at 158:20–160:19. Plaintiffs dispute these statements by asserting that the interests were the equivalent of shares of stock. *Pl.'s Response at ¶ 42, 43; Reali/Rosen 8/28/01 Letter, pp. 4–8, Ex. 9; Dunham 3/26/08 Tr. at 30:13–31:5, Ex. 14*. These interests, Plaintiffs assert, could be transferred together with the policies. *Id*.

MetLife responds by asserting that Plaintiffs have not raised any additional facts inconsistent with theirs. *Def.'s Reply at 7, ¶ E*. MetLife points to Plaintiffs' expert witness's admission that the policyholders' membership interests were both "illiquid" and "restricted." *Id.; Ex. 24 at 320:11–22*. Plaintiffs do not dispute that membership interests are not separately transferable from the policy. *Def's Reply at 7, ¶ E*. Additionally, the fact that a policyholder's transfer of the policy includes the simultaneous transfer of any membership interests attached to the policy is not disputed. *Id*.

MetLife disputes Plaintiffs' statement that the membership interests were the equivalent to shares of stock, asserting that such characterization is a misstatement of both the evidence and the law. *Def.'s Reply at 8, ¶ E*. MetLife cites to undisputed evidence, showing that unlike stocks, the membership interests were not transferable by sale or bequest or tender back to the Company separate from the underlying policy. Additionally, the interests could not be borrowed against, terminated without value upon termination of the underlying policy by death, maturity, lapse, or surrender. MetLife also notes that policyholders' risk is underwritten by the Company and benefits guaranteed, unlike stock which has fluctuating value that is entirely at risk. *Def.'s Reply at 8*; Ex. 48 ¶¶ 2, 3, 7(d); Ex. 34 at 159:16–160:6; Ex. 24 at 320:11–22; *see also Dryden v. Sun Life Assur. Co.*, 737 F.Supp. 1058, 1063 (S.D.Ind.1989); *State v. N.W. Mut. Ins. Co.*, 86 Ariz. 50, 340 P.2d 200, 204 (1959); *Lubin v. Equitable Life Assur. Soc'y of U.S.*, 326 Ill.App. 358, 61 N.E.2d 753, 756–57 (1945); *N.Y. Life Ins. Co. v. Burbank*, 209 Iowa 199, 216 N.W. 742, 743 (1927); *Louisville Bd. of Ins. Agents v. Jefferson County Bd. of Educ.*, 309 S.W.2d 40, 41 (Ky.1957); *People ex rel. Venner v. N.Y. Life Ins. Co.*, 111 A.D. 183, 97 N.Y.S. 465, 467 (1906); *Lawrence*. Plaintiffs cite no evidence to the contrary. *Def.'s Reply at 8, ¶ E*.

Prior to demutualization, a policyholder's membership interests would vanish without any compensation to the policyholder or the policyholder's survivors upon termination of the policy by either death, surrender, lapse or maturity. *Def.'s Statement of Material Fact ¶ 44; Ex. 48 ¶ 2; Ex. 36 at 212:23–213:12; Ex. 34 at 159:19–20, 159:25–160:6, 163:25–164:5.* MetLife notes that the interests of "tens of millions" of former policyholders terminated without any compensation prior to demutualization. *Def.'s Statement of Material Fact ¶ 45.*

Plaintiffs dispute MetLife's statements, stating that some MetLife policies paid an additional "terminal" dividend upon termination of a policy, implying that there was compensation for the termination of membership interests. *Pl.'s Response ¶ 44. See, e.g., Dividend Resolutions 1992–2000 pp. 8, 13, 16, 22, 25, Table A, column 5, Ex. 31.* Additionally, Plaintiffs cite MetLife's actuarial expert's failure to cite to any evidence establishing how many policyholders' membership interests lapsed without compensation. *Pl.'s Response ¶ 45; Def. Ex. 48 ¶ 5. See, e.g., Dividend Resolutions 1992–2000 pp. 8, 13, 16, 22, 25, Table A, column 5, Ex. 31.*

However, MetLife asserts that Plaintiffs have not contested the factual validity of MetLife's statement that membership interests vanished without compensation when a policy terminated by death, surrender, lapse or maturity. MetLife contends that Plaintiffs have alleged additional facts that are not inconsistent with MetLife's statements. *Def.'s Reply at 9.* MetLife maintains that terminal dividends are policy dividends, not compensation for loss of membership interests. MetLife notes that Plaintiffs' cited evidence only shows that MetLife declared approximately 2 to 3 percent as terminal dividends during certain years and has failed to show that those dividends were compensation for loss of membership interests. *Def.'s Reply at 9; Ex. 34 at 159:16–160:6; Ex. 90 at 50:2–20; Ex. 87 at 60:3–11.*

Contrary to Plaintiffs' assertions, MetLife contends that the undisputed evidence shows that terminal dividends bear no relation to the termination of membership interests. *Def.'s Reply at 9.* Prior to demutualization, MetLife only paid terminal dividends when the policy so provided and not all policies provided for such payments. *Ex. 90 at 49:21–50:20.* The Plan, by its terms, preserves all dividend rights granted by a policy and excludes those rights from its definition of membership interests. *Def.'s Reply at 9; Ex. 7 Art. II, Policyholders' Membership Interests; Ex. 7 § 3.1(b)-(c).* Metropolitan Life Insurance Company, now operating as a stock company, continues payment of terminal dividends when the policy so provides, despite the termination of all membership interests by operation of the Plan at the time of demutualization. *Def.'s Reply at 9; Ex. 7 §§ 3.1(c), 8.1.* Additionally, MetLife asserts that Plaintiffs have not contested that many policyholders' membership interests terminated without value and that the precise number is immaterial. *Def.'s Reply at 10.* Thus, MetLife contends that the undisputed evidence shows that the payment of terminal dividends was not compensation for the termination of membership interests. *Id.*

MetLife further differentiates membership interests from shares of stock, stating that a policyholder's membership interest, prior to demutualization, did not represent "any ascertained percentage of the Company." *Def.'s Statement of Material Fact ¶ 46; Ex. 48 ¶¶ 2, 7(a); Ex. 34 at 159:1–162:23.* Plaintiffs assert that MetLife's cited evidence does not support their statement. *Pl.'s Response ¶ 46.* Plaintiffs contend that, prior to demutualization, and

pursuant to the Plan, MetLife was required to ascertain the contribution of each policyholder to the surplus annually and calculate each policyholder's equity share. *Pl.'s Response ¶ 46; N.Y. Ins. Law § 4231; MetLife 1996 Actuarial Statement, p. 1, Ex. 49; MetLife Dividend Resolutions 1992–2000; Ex. 31; Plan § 7.2 (PIB 1 at 80) and PIB 1 at 18–19, Def. Ex. 1.*

MetLife asserts that there is no genuine issue of material fact, because as a matter of law, their statement is correct, *See Defendants' Memorandum in Support ("Defs.' Mem.")* at 21, and Plaintiffs merely alleged additional facts not inconsistent with the statements. *Def.'s Reply at 10.* MetLife does not dispute that MetLife is required, by law, to make annual determinations about dividends and their equitable distribution among policyholders. *Def.'s Reply at 10; N.Y. Ins. Law § 4231.* MetLife's dividends were determined by the estimated contribution of each class of dividend-paying policy to surplus. *Def.'s Reply at 10; Ex. 87 at 27:8–30:6.* The undisputed evidence also shows that MetLife, now operating as a stock company, continues to "ascertain and allocate annual policy dividends on the basis of contribution to surplus," *Def.'s Reply at 10–11; Ex. 87 at 27:8–30:6, 34:22–35:13; Ex. 80 at 499:9–15,* despite the termination of membership interests. *Ex. 7 § 3.1(c).*

It is also undisputed that MetLife, pursuant to the Plan calculated a ratio referred to by the Plan as the "variable equity share." *Def.'s Reply at 11.* MetLife asserts that Plaintiffs do not contend, and fail to cite any evidence showing that this ratio represents an "ascertained percentage of the Company" as it existed prior to demutualization. *Id.* MetLife contends that the "variable equity share," pursuant to the Plan, was the percentage of shares of stock to be allocated to policyholders upon demutualization (excluding

the fixed component). *Def.'s Reply at 10; Ex. 7 § 7.2; Ex. 20 at 108:3–14, 109:17–110:10.*

MetLife states that membership interests in the Company prior to demutualization had no independent value apart from any value created by the Plan. *Def.'s Statement of Material Fact ¶ 47; Ex. 33 at 45:13–46:12; Ex. 35 at 350:18–351:3; Ex. 30 at 87:9–88:10; Ex. 17 at 30:12–31:7.* Plaintiffs dispute this statement by asserting that policyholders' membership interest essentially made them owners of the Company, which is a valuable entity. *Pl.'s Response ¶ 47; Reali/Rosen 8/28/01 Letter, pp. 4–8, Ex. 9; MetLife 10/13/03 Request for Tax Conciliation at 4, Ex. 10.*

MetLife contends that Plaintiffs have failed to genuinely dispute their statement, but instead raised additional factual allegations that are not inconsistent with their statements. *Def.'s Reply at 11.* MetLife asserts that what a policyholders' interest is called is merely a semantic discussion and that Plaintiffs have failed to dispute that membership interests in a mutual company has no value absent a demutualization or a solvent liquidation. *Id.* There does not appear to be a disputed issue of fact here, only different conclusions of law.

MetLife takes the position that other than what the Plan specified, no policyholder of the Company had any contractual, statutory, or other right to receive any amount or form of consideration. *Def.'s Statement of Material Fact ¶ 48; Ex. 48 ¶¶ 7(b), (f), (g), 37; Ex. 18 at 119:23–120:16, 121:2–16; Ex. 34 at 41:13–43:18; 162:24–163:8; Ex. 33 at 15:18–16:21, 43:12–44:19; Ex. 17 at 150:2–9; N.Y. Ins. Law §§ 7312(c), (e)(3).* Plaintiffs dispute the statement and assert that if the Plan was rejected by the policyholders, they had contractual and statutory rights to receive an annual distribution of surplus and the right to elect a Board that would propose a

demutualization plan that was in their best interests. *Pl.'s Response* ¶ 48; *N.Y. Ins. Law §§ 3203, 4231 and § 4210.*

MetLife asserts that Plaintiffs' contentions fail to raise a genuine issue of fact and is misleading, because as a matter of law, policyholders had no such rights. *Def.'s Reply at 12.* In the event the policyholders did have such rights, they would have retained them regardless of whether the Plan was implemented or not. *Id.; See Def.'s Reply* ¶ 29, 30. MetLife further asserts that any such dispute over the meaning and effect of applicable statutes is a dispute of law, not of fact. *Id.* MetLife does not dispute that policyholders, prior to demutualization, could vote for members of the Board. *Def.'s Reply at 12.* It is undisputed that differences between the mutual and stock forms of organization were fully and repeatedly disclosed to materials distributed to policyholders. *Def.'s Reply at 12; Ex. 1 at 7, 16, 17; Ex. 7 Art. II, Policyholders' Membership Interests, § 3.1(c).*

MetLife further contends that Plaintiffs' statement that policyholders could "elect a board" to "propose a plan of demutualization that was in their best interests" is a mischaracterization of the undisputed facts and the law: (1) Plaintiffs do not dispute that the Plan was elected by the policyholders; (2) as a matter of law, policyholders have no right to force the Board to adopt a any demutualization plan and Plaintiffs have failed to cite any evidence that they would have done so; (3) the demutualization plan required not only Board approval, but also a two-thirds policyholder vote and approval by the Superintendent of Insurance. *Def.'s Reply at 12–13.* Defendant asserts that Plaintiffs do not cite any evidence that any alternative demutualization plan would have passed successfully. *Id.*

*Exchange of Membership Interests for Stock, Cash or Policy Credits*

Pursuant to the Plan, upon demutualization eligible policyholders received consideration in exchange for their extinguished membership interests. *Def.'s Statement of Material Fact* ¶ 49; *Ex. 35 at 340:5–11, 349:10–16, 396:18–397:10; Ex. 20 at 69:10–19, 109:19–110:10.* The Plan further provided that this consideration would take the form of either (a) Metropolitan Life Insurance Company stock, which was then exchanged for Trust interests in MetLife, Inc. stock, (b) cash or (c) policy credits. *Def.'s Statement of Material Fact* ¶ 50; *Ex. 7 §§ 3.1(c), 5.1(d)(iii), 5.1(e)(ii)(iv), 7.1(a).*

Plaintiffs dispute MetLife's characterization of the consideration given to eligible policyholders and assert that regardless of the form of payment, the consideration received by eligible policyholders was an allocation of Metropolitan stock. *Pl.'s Response* ¶ 50; *Def. Ex. 52; In Re MetLife Demutualization Litigation, Court's 8/29/06 Order on Scope of Class, Dkt. 254.*

MetLife responds by asserting that Plaintiffs raise an issue of law, not fact. MetLife contends that it is undisputed that the consideration was *based* on an allocation of Company stock, but by the clear terms of the Plan, the consideration allocated was either cash, stock or policy credits. *Def.'s Reply at 13; Ex. 7 Art. I, §§ 3.1(c), 5.2(d)(iii), 7.1(a).* MetLife argues that Plaintiffs' "contrived interpretation" of the plain language of the Plan raises a question of law and that the undisputed evidence has shown that the Plan was carried out in adherence to those plain terms. *Def.'s Reply at 13; Ex. 35 at 306:5–11, 349:10–16; 396:18–397:10; Ex. 20 at 109:15–110:10.*

The consideration given to Eligible Shareholders was expressed by the Plan in terms of an allocation of Company stock,

regardless of the form it was actually to be issued or paid. *Def.'s Statement of Material Fact ¶ 51; Ex. 7 §§ 7.1(a), (b); Ex. 20 at 108:3–14, 109:17–110:10.* In accordance with the Plan, the PIB stated:

> Regardless of whether you will be paid in the form of shares of Common Stock (to be held in the trust), cash or Policy Credits, the compensation you will receive for your Policyholders' Membership Interest will be based upon the number of shares of MetLife common stock allocated to you under the terms of the Plan as described below.

*Def.'s Statement of Material Fact ¶ 52; Ex. 1 at 18.*

*Amount of Consideration to Policyholders*

Pursuant to the Plan, 700 million shares of Company stock were allocated to policyholders as consideration for their membership interests. *Def.'s Statement of Material Fact ¶ 53; Ex. 1 Art. II, Allocable Common Shares.* This allocation represented all of the Company's "initial common equity." *Def.'s Statement of Material Fact ¶ 54; Ex. 35 at 363:9–12.* Plaintiffs dispute MetLife's statement and assert that the allocation did not represent the Company's "initial" equity because the Company had been in business for many years and that, prior to demutualization, the policyholders were MetLife's equity "owners." *Pl.'s Response ¶ 54; Reali/Rosen 8/28/01 Letter, pp. 4–8; Ex. 9; Friedman 8/5/99 Letter to NYID, p. 3, Ex. 11.* In turn, MetLife asserts that Plaintiffs' "quibble" over whether the Company's equity was "initial" or not is immaterial because Plaintiffs do not dispute that the 700 million shares represented all of the Company's equity at the time of demutualization.

The PIB stated that "A total of 700 million shares of MetLife common stock, representing 100 percent of MetLife's equity ownership, will be allocated to all Eligible Policyholders." *Def.'s Statement of Material Fact ¶ 55; Ex. 1 at 18.* The cover letter mailed with the PIB stated that "The Demutualization will allocate 100 percent of the stock of the company at the time of the demutualization to our eligible policyholders to be paid in the form of stock, cash or policy credits." *Def.'s Statement of Material Fact ¶ 56; Ex. 4.*

Pursuant to the Plan, policyholders who received consideration in the form of MetLife, Inc. common stock, to be held in trust for the policyholders' benefit, received one share of Company common stock for every share that was allocated to them. *Def.'s Statement of Material Fact ¶ 57.* The shares of Company common stock, held in trust, were then exchanged for an equal number of shares of MetLife, Inc. common stock. *Id.; Ex. 7 §§ 3.1(c), 5.2(d)(iii), 5.2(e)(ii)-(iv).*

The value of the MetLife, Inc. shares varied and continues to fluctuate according to market prices. *Def.'s Statement of Material Fact ¶ 58; Ex. 34 at 124:23–125:10.* Plaintiffs dispute this statement and assert that the value of the MetLife, Inc. shares held in trust for eligible policyholders was not accurately represented by the market value of those shares. Plaintiffs contend that the approximately 494.5 million shares, or 63% of MetLife's equity, that were placed in the Trust upon demutualization represented a controlling interest in MetLife, and thus carried with it a greater aggregate value per share of the controlling "block." *Pl.'s Response ¶ 58; Reali 4/25/00 Board Slide Presentation, slide 5; Ex. 43; Wheeler 7/13/06 Dep. Tr. at 25:16–26:7; Ex. 3.* MetLife asserts that Plaintiffs cited evidence only applies to the acquisition of a controlling interest during a merger or acquisition and not to the instant case, which concerns a demutualiza-

tion followed by an IPO. Control premiums, MetLife asserts, do not apply in the instant case. *Def.'s Reply at 15; Pls.' Ex. 3 at 26:4–7; Defs.' Reply Mem. at 3; Ex. 93 at 17:2–13.*

Pursuant to the Plan, policyholders who received consideration in the form of cash or policy credits received an amount determined by multiplying (a) the number of common shares allocated to the policyholder by (b) the IPO price per share of MetLife's common stock. *Def.'s Statement of Material Fact ¶ 59; Ex. 7 § 7.3(f).* The PIB also stated:

> The compensation you will receive will be calculated by multiplying the total number of shares of Common Stock allocated to you by the IPO Price. If you receive shares (to be held in the Trust), the value of the shares will depend upon the market value of the Common Stock, which may change from time to time.

*Def.'s Statement of Material Fact ¶ 60; Ex. 1 at 2.* For policyholders receiving consideration in cash, the PIB further provided that "[t]he payment amount will equal the number of shares allocated to you multiplied by the IPO price, less any required withholding tax." *Def.'s Statement of Material Fact ¶ 61; Ex. 1 at 23.*

The PIB did not indicate that the IPO value or subsequent market value of MetLife, Inc. common stock would equal the amount that a buyer would pay during the sale of the entire company. *Def.'s Statement of Material Fact ¶ 62; Exs. 1, 2, 3, 4.* However, Plaintiffs assert that the Prospectus explained that the IPO value of MetLife, Inc. common stock would be the amount that the buyer, MetLife, Inc., would pay for ownership of Metropolitan:

> *"Upon demutualization, the ownership of MetLife [Metropolitan] will be transferred to our newly formed Holding Company MetLife, Inc. In other words, MetLife [Metropolitan] will become a wholly-owned subsidiary of the Holding Company."*

*Pl.'s Response ¶ 62; Prospectus, PIB 1, p. 13; Deft. Ex. 1; 1/24/00 Public Hearing Tr. at 12, Ex. 25; MetLife 2/11/00 Post–Hearing Submission, p. 2, Ex. 21.*

MetLife asserts that, as a matter of law, the portion of the Prospectus quoted above is not inconsistent with their statement. Transfer of ownership to a newly formed holding company is a corporate reorganization, not the sale of a company or an acquisition. *Def.'s Reply at 15; See Defs.' Reply Mem. at 4–5; Int'l Controls Corp. v. Vesco,* 490 F.2d 1334, 1343 (2d Cir.1974); *Gelles v. TDA Indus., Inc.,* 1993 WL 275216, at *10–11, 1993 U.S. Dist. LEXIS 9779, at *30–31 (S.D.N.Y. July 16, 1993). Furthermore, MetLife argues that the PIB clearly disclosed that policyholders' consideration would be based on the IPO value of the MetLife, Inc. common shares, not by a sale to a single buyer. *Def.'s Reply at 15; Ex. 1 at 6, 9, 19, 23, 35, 40; Ex. 2 at 4.*

*IPO and Related Transactions*

At the time of demutualization, MetLife, Inc. conducted a public offering of convertible equity security units and a private placement of common stock, also known as an initial public offering (IPO). *Def.'s Statement of Material Fact 63; Ex. 29 at 86:21–88:1.* The PIB stated that MetLife, Inc. was authorized to conduct capital raising transactions, including but not limited to the sale of shares of common stock in an IPO. *Def.'s Statement of Material Fact ¶ 64; Ex. 1 at 9, 13, 35, 67; Ex. 2 at 4–5, 20, 41, 72–73.* Upon demutualization, holders of the common stock will consist of the Trust, which hold shares on behalf of the policyholders. Following the IPO, other investors may purchase shares of common stock. *Def.'s Statement of Material Fact ¶ 65; Ex. 1 at 6.*

The IPO price of MetLife, Inc. common stock was $14.25/share. *Def.'s Statement of Material Fact ¶ 66; Ex. 59 at 2; Ex. 29 at 74:20–22; Ex. 25 at 53:11–13.* The IPO price was determined, according to Met-Life, by consideration of investors' interest during the road show process where Met-Life management marketed the IPO to potential investors and through negotiations with Goldman Sachs & Co., the Company's financial advisor, which was responsible or pricing the IPO. *Def.'s Statement of Material Fact ¶ 67; Ex. 29 at 135:23–136:12; Ex. 40 at 26:21–27:9; Ex. 17 at 104:23–107:3.* Plaintiffs assert that the IPO price was set by a joint pricing committee. *Pl.'s Response ¶ 67; MetLife 56.1 Statement ¶ 73 infra; Joint Pricing Committee 4/4/00 Minutes and Resolutions; Ex. 44; Prospectus, PIB 2 pp. 141–43; Def. Ex. 2.* It is undisputed that setting a higher IPO price would have reduced demand for the shares. *Def's Statement of Material Fact ¶ 68; Ex. 36 at 263:5–24; Ex. 17 at 104:23–107:3; Ex. 29 at 142:13–17.*

MetLife asserts that at or around April 2000, MetLife, Inc. could not have raised sufficient capital in an IPO to conduct a Method 2 demutualization. *Def.'s Statement of Material Fact ¶ 69; Ex. 47 ¶¶ 15–17; Ex. 48 ¶ 31; Ex. 33 at 112:22–118–8; Ex. 34 at 133:25–134:5, 140:22–142:3; Ex. 18 at 233:8–234: 11.* MetLife states, and the Court agrees, that there was no evidence that the Company or MetLife, Inc., at or around April 2000, was capable of raising the necessary capital by any means to conduct a Method 2 demutualization. *Def.'s Statement of Material Fact ¶ 70; Ex. 48 ¶ 31; Ex. 18 at 238:18–239:2; Ex. 33 at 112:22–118:8; Ex. 34 at 133:25–134:5, 140:22–142:3.* According to MetLife, there is no evidence that, at or around the time the IPO was conducted, the Company was capable of conducting a Method 2 demutualization that would not have harmed the Company's financial position and served the goals of the Plan as effectively as Method 4 demutualization. *Def.'s Statement of Material Fact ¶ 71; Ex. 34 at 135:20–136:7, 140:22–142:3; Ex. 48 ¶¶ 30–31; Ex. 41 at 219:17–221:2.*

In response, Plaintiffs assert that Met-Life, based on an "extremely crude estimate" in 1997, dropped consideration of what a Method 2 demutualization would pay to policyholders and never determined if sufficient capital could be raised through an IPO. *Pl.'s Response ¶ 69; Weiss 5/19/97 Project Corvette Memo; Ex. 26; Reali 5/17/06 Tr. At 120:18–121:4; Ex. 17; Weiss 5/4/06 Tr. at 31:7–13; Ex. 27.* Additionally, Plaintiffs assert that MetLife's value was more than what Method 2 required to be paid to policyholders and that MetLife's IPO could be delayed up to one year. *Pl.'s Response ¶ 70, 71; [Weiss 5/19/97 Project Corvette Memo; Ex. 26; Reali 5/17/06 Tr. at 120:18–121:4; Ex. 17; Weiss 5/4/06 Tr. at 31:7–13; Ex. 27]; Wilcox/Harris 8/28/07 Report, pp. 2, 19–20; Def. Ex. 44; Prospectus, PIB 1, p. 51, Def. Ex. 1.* MetLife, in response, asserts that Plaintiffs only raise additional factual allegations that are not inconsistent with MetLife's statements and have not raised an issue of material fact preventing summary judgment in their favor. *Def.'s Reply at 17.*

The PIB stated that the IPO price was to be determined by "arm's length negotiations with representatives of the underwriters," and will be based on (1) prevailing market conditions, (2) the Company's historical performance, (3) estimates of Company's business potential and earnings prospects, (4) an assessment of the Company's management and (5) consideration of all factors in relation to the market value of other similar businesses. *Def.'s Statement of Material Fact ¶ 72; Ex. 2 at 74–75.* Plaintiffs dispute the statement and assert that the IPO price was negoti-

ated by MetLife and their investment bankers and that the price was ultimately set by the Joint Pricing Committee. *Pl.'s Response ¶ 72; Joint Pricing Committee 4/4/00 Minutes and Resolutions. Ex. 44; Dunham 3/26/08 Tr. at 300:22–301:21; Ex. 14.* MetLife contends that Plaintiffs simply raise additional uncontested facts that are consistent with MetLife's statements. *Def.s' Reply at 1, ¶¶ (C).*

The PIB further stated that "[t]the final decision on pricing of the IPO and any Other Capital Raising Transactions to be completed on the Plan Effective Date will be made on or before the Plan Effective Date by a joint pricing committee of the boards of directors of MetLife and the Holding Company." *Def.'s Statement of Material Fact ¶ 73; Ex. 1 at 39.* Pro forma financial data based on an IPO price range of $14 to $24 per share was also provided in the PIB. *Def.'s Statement of Material Fact ¶ 74; E.g., Ex. 2 at 29.* The PIB stated, in bold type:

> We have based the pro forma information on available information and on assumptions management believes are reasonable and that reflect the effects of these transactions. We have provided the pro forma information for informational purposes only. The number of shares actually sold in the initial public offering and the initial public offering price may vary from the amounts assumed.

*Def.'s Statement of Material Fact ¶ 75; Ex. 2 at 29.* Plaintiffs disputes the above quoted language contained in the PIB, contending that since some of the assumptions underlying the pro forma information was false at the time, it could not have been reasonable. *Pl.'s Response ¶ 75; Investment Bankers 10/26/99 Memo (Materials for 10/26/99 Bd. Comm. Mtg.); pp. 1–2, Slide 24; Ex. 24.* According to MetLife, however, the alleged misrepresentation

was not plead in the complaint and is not a part of this case. *Def.'s Reply at 17, ¶¶ (2).* Furthermore, MetLife contends that Plaintiffs fail to specify what assumptions were false or unreasonable and the evidence cited by Plaintiffs does not illustrate their contentions but is actually consistent with the pro forma estimates included in the PIB. *Id.*

The PIB stated that "[t]he Initial Public Offering might take place at a time when market conditions or MetLife's financial performance or prospects cause the price per share of the Common Stock in the Initial Public Offering to be lower than it might have otherwise been." *Def's Statement of Material Fact ¶ 76; Ex. 1 at 20.* Plaintiffs only dispute the characterization "warned" used in MetLife's 56.1 Statement.

The Company's financial advisors, Credit Suisse First Boston Corporation and Goldman, Sachs & Co., provided opinions which were reprinted in the PIB as follows:

> We believe that trading in the Holding Company Common Stock for a period following the completion of a distribution of the Holding Company Common Stock, including the IPO, may be characterized by a redistribution of the Holding Company Common Stock among the Eligible Policyholders and other investors. It is possible that during these periods of redistribution the Holding Company Common Stock may trade at prices below the prices at which it would trade on a fully-distributed basis.

*Def.'s Statement of Material Fact ¶ 77; Ex. 2 at A–7–A8, A–12.* Plaintiffs contend that the above quoted language was not part of the advisors' opinion. *Pl.'s Response ¶ 77.* They further assert that the language is false since advisors provided MetLife with presentations showing that the IPO would be less than full-distributed

prices and illustrating the price differences. *Pl.'s Response ¶ 77; Prospectus PIB 2, pp. A–5 to A–12, Def. Ex. 2; Investment Bankers 10/26/99 Memo to Board, pp. 1–2; Ex. 24.* MetLife asserts that Plaintiffs do not genuinely dispute their statement, and that Plaintiffs have failed to cite to evidence supporting their assertions and the disputes are not material. *Def.'s Reply at 33, ¶¶ (2).*

*Allocation of Consideration Among Policyholders*

All eligible policyholders were allocated a "Fixed Component" minimum of ten shares. *Def.'s Statement of Material Fact ¶ 78. Ex. 7 § 7.1(b)(1); Ex. 20 at 63:19–22.* The "Variable Component," based on an actuarial formula, allocated additional shares to certain eligible policyholders. *Def.'s Statement of Material Fact ¶ 79; Ex. 25 at 34:16–35:25; Ex. 39 at 85:5–17, 163:19–164:9; Ex. 7 §§ 7.1(b)(ii), 7.2(a), (b).* The Variable Component's actuarial formula was developed through consultation between the Company and its actuarial advisor and the Department and its actuarial consultants. *Def.'s Statement of Material Fact ¶ 80; Ex. 38 at 73:16–23; Ex. 27 at 355:24–356:17.* Other than the characterization that MetLife "worked closely" with the Department, MetLife's statement is undisputed. *Pl.'s Response ¶ 80.* The Company also "consulted" with the Department to determine the Fixed Component to be allocated to shareholders. *Def.'s Statement of Material Fact ¶ 81; Ex. 33 at 180:21–183:25; ·Ex. 38 at 209:2–210:8.* Plaintiffs dispute the characterization "consulted" and asserts that the Department did not make any proposal about a fixed component. *Pl.'s Response ¶ 81.*

An Opinion and Decision issued by the Superintendent of Insurance stated: "The consideration to be given to the policyholders of MetLife will be allocated among such policyholders in a manner which is fair and equitable, in compliance with Section 7312(d)(4)(B)." *Def.'s Statement of Material Fact ¶ 82; Ex. 52 ¶ 205.* Plaintiffs, citing to the Second Amended Complaint, allege "that the allocation injured participating policyholders in violation of federal securities law." *Pl.'s Response ¶ 82.* MetLife correctly asserts that Plaintiffs have failed to materially dispute their statement and cannot rely on conclusory allegations in their complaint to raise an issue of material fact. *Def.'s Reply at 1, ¶¶ (B).* There is no material issue of fact as to this statement.

*Allocation of the Variable Component*

All of the approximately 700 million shares of Company common stock that were allocated to Eligible Policyholders under the Plan were either allocated as the Fixed Component or the Variable Component. *Def.'s Statement of Material Fact ¶ 83; Ex. 7 § 7.1(b); Ex. 35 at 389:1–390:5.* Only policyholders who owned "Qualifying Policies", policies that were in force on the adoption date of the plan and had been determined to have a positive "Actuarial Contribution," were eligible to receive the Variable Component. *Def.'s Statement of Material Fact ¶ 84; Ex. 7 Art II, § 7.2(i), (ii); Ex. 40 at 162:1–22; Ex. 38 at 44:20–13; Ex. 20 at 163:10–24.* The Actuarial Contribution consisted of the sums of (1) a Qualifying Policy's estimated past contributions to the Company's surplus and (2) the present value of its projected future contribution to the Company's surplus. *Def.'s Statement of Material Fact ¶ 85; Ex. 14 at 2; Ex. 38 at 14:18–16:1.*

Pursuant to the Plan, an Eligible Policyholder's Variable Component was calculated by (1) taking the sum of the positive actuarial contributions of the policyholder's Qualifying Policies, (2) dividing it by the sum of the positive actuarial contributions of all Eligible Policyholders' Qualifying

Policies, and (3) multiplying the result by the total number of shares available for allocation as the aggregate Variable Component. *Def.'s Statement of Material Fact ¶ 86; Ex. 7 § 7.2(i).* Additionally, each Qualifying Policy with a negative actuarial contribution was treated as having an actuarial contribution of zero. *Def.'s Statement of Material ¶ 87; Ex. 7 § 7.2(i), Ex. 14 at 3; Ex. 38 at 67:25–68:8.* Nonparticipating policies and polices not in force at the adoption date of the Plan were not included in the calculation of Actuarial Contribution or the Variable Component. *Def.'s Statement of Material Fact ¶ 88;* Ex. 7 Art II, *Actuarial Contribution, Aggregate Variable Component, Participating Policy, Qualifying Policy,* §§ 7.1(b)(ii), 7.2(a); Ex. 39 at 236:3–20; Ex. 25 at 223:5–25.

Schedule 5 to the Plan, the Actuarial Contribution Memorandum stated: "the sole use of the AC [Actuarial Contribution] calculations was to determine the contribution to surplus of a given policy *relative to* all other policies." *Def.'s Statement of Material Fact ¶ 89; Ex. 14 at 3* (emphasis in original). Plaintiffs contend that the above quoted language was not included in the summary of Schedule 5, *Def. Ex. 1 at 139,* which was distributed to policyholders in the PIB. *Pl.'s Response ¶ 89.* Instead, Plaintiffs assert that the language was in Schedule 5 but not in its summary provided to policyholders. *Id.* MetLife states that the aforementioned method of calculating the Variable Component is consistent with "the usual practice in recent U.S. life insurance company demutualizations." *Def.'s Statement of Material Fact ¶ 90; Ex. 15 at 94:18–95:2; Ex. 27 at 372:21–13; Ex. 18 at 112:8–114:19.*

MetLife asserts that there were no representations made that the variable component would equal or approximate the sum of positive actuarial contributions of the policyholders and maintains that nothing in the PIB stated that the variable component would equal or approximate the positive actuarial contributions of a policyholder's qualifying policies. *Def.'s Reply ¶ 0; Def.'s Statement of Material Fact ¶ 91; Exs. 1, 2, 3, 4.* Plaintiffs, however, assert that MetLife did make such representations by stating that the variable component was based on an actuarial formula based on a policy's contribution to the Company's surplus. *Pl.'s Response ¶ 91.* Plaintiffs assert that MetLife's statements represented that the variable component would be reasonable in relation to total actuarial contributions under actuarial standards that that under actuarial standards reasonableness is approximate equality. *Pl.'s Response ¶ 91; Actuarial Standard of Practice 37 at 4; Ex. 18; Carroll 2/15/08 Tr. at 44:25–48:24; Ex. 46.* MetLife, in response, asserts Plaintiffs misstate the evidence and that the Actuarial Standard of Practice cited by Plaintiffs was not in effect at the time of demutualization, *see* Ex. 57, and even if applicable, does not support Plaintiffs' claims. *see* Ex. 82 at 18:3–21:23. *Def.'s Reply at 18.*

The PIB stated, among other things, as follows:

> The formula for allocating the shares among Eligible Policyholders consists of two parts:
>
> *Minimum allocation (the fixed component of the compensation)*—If you are an Eligible Policyholder, you will be allocated 10 shares, regardless of the number or face amount of Policies you own in the same capacity. Some Eligible Policyholders will receive an additional variable allocation of shares.
>
> *Additional allocation (the variable component of the compensation)*—If you own a Policy that is a Participating Policy, you may be allocated additional shares. The number of additional

shares you will receive will be based on an actuarial formula. This formula takes into account, among other things, the Policy's past and estimated future contributions to MetLife's surplus. *Def.'s Statement of Material Fact ¶ 92; Ex. 1 at 18.*

MetLife distinguishes "actuarial formula" from actuarial "concepts" or "standards of practice." *Def.'s Reply ¶ P.* MetLife asserts that, from the above quoted description, it was clear that: (1) the fixed component was not based on an actuarial formula (2) that the variable component was based on an actuarial formula, and (3) the actuarial formula was used for allocation purposes. *Def.'s Statement of Material Fact ¶ 93; Ex. 41 at 168:5–169:24.*

Plaintiffs assert that it was not made clear that the fixed component was based on an actuarial formula. Plaintiffs cite to the actuary's opinion letter attached to the Prospectus which states that his opinion on the fixed component was based on "actuarial concepts and standards of practice." *Pl.'s Response ¶ 93.* Plaintiffs also cite to the statements of a MetLife actuarial advisor made at a public hearing on demutualization: "The size of the fixed component, under MetLife's plan, relative to the total compensation to be distributed to all eligible policyholders is consistent with applicable actuarial literature and with previous demutualizations." *Pl.'s Response ¶ 93; PIB 2 at A–13; Def. Ex. 2; 1/24/00 Public Hearing Tr. at 43; Ex. 25.* MetLife asserts that Plaintiffs are attempting to "create confusion" and fail to cite any evidence showing that a "formula" is the same as a "concept" or "standard of practice." *Def.'s Reply at 19.*

The PIB provided the following summary of Schedule 1 to the Plan:

"As described in Article VII of the Plan, the Aggregate Variable Component shall be allocated to Eligible Policyholders for their Qualifying Policies based on the Actuarial Contribution for such Qualifying Policy relative to the sum of the Actuarial Contributions for all Qualifying Policies." *Def.'s Statement of Material Fact ¶ 94; Ex. 1 at 128.*

MetLife's actuarial advisor, Kenneth M. Beck of PricewaterhouseCoopers, LLP issued a Statement of Actuarial Opinion, which was reprinted in the PIB, stated the following:

The distribution described in Article VII of the Plan takes into account the ratio of the positive sum of the estimated past and future contributions to MetLife surplus, if any, of each participating Policy and Contract owned by each Eligible Policyholder to the total of all such positive sums. Most of the consideration to be distributed to policyholders is allocated on this basis. Under Section 7312 of the New York Insurance Law, there is no specific guidance given for the allocation of consideration in a "Method Four" reorganization, but policyholder contributions are specifically identified as an acceptable approach to allocation of consideration under other methods of reorganization within this section of the law. In addition, the contribution method is recognized in the actuarial literature as an appropriate method. I therefore find that the use of "actuarial contribution" as the principal basis underlying the allocation of consideration is fair and equitable. The distribution to policyholders also takes into account, to a lesser extent, the fact that policyholders have intangible membership rights that are independent of their actuarial contributions. Each Eligible Policyholder (participating or nonparticipating) is, under the Plan, allocated a fixed number of shares of common stock without regard to the contribution of that policyholder

or of the class or classes in which policies held by the policyholder happen to reside. Under the Plan, the percentage of the total consideration that is allocated in this manner is significantly less than that allocated in proportion to positive contributions, which is appropriate as well as consistent with the approach used in previous demutualizations.

*Def.'s Statement of Material Fact ¶ 95; Ex. 2 at A13–A14; Ex. 15 at 26:8–11.* Plaintiffs do not dispute that the document contains the above quoted language but argue that the statement is incomplete. Plaintiffs assert that the document also states: "This opinion . . . reflects the application of actuarial concepts and standards of practice to the requirements set forth in [N.Y. Ins. Law] Section 7312 [New York Demutualization Statute]." *Pl.'s Response ¶ 95; Prospectus, PIB 2 at A–13; Def. Ex. 2.*

### The Fixed Component

The allocation of the variable component is perhaps the most hotly contested aspect of the demutualization. This allocation is the basis of the only claim on which Plaintiffs have moved for summary judgment. MetLife states that the PIB "made clear" that, regardless of the number of policies the policyholder owns or the size, amount, age, type, dividend eligibility or other characteristics of the policies, the fixed component for each eligible policyholder was 10 shares. *Def.'s Statement of Material Fact ¶ 96; Ex. 1 at 18, 23, 128.* Plaintiffs dispute the characterization "made clear" and assert that it was not. *Pl.'s Response ¶ 96.*

MetLife asserts that nothing in the PIB stated that the fixed component was determined by an actuarial formula. *Def.'s Statement of Material Fact ¶ 97; Exs. 1, 2, 3, 4.* Plaintiffs dispute MetLife's statement and point to the opinion of MetLife's actuarial advisor, PWC, which states: "This opinion . . . reflects the application of actuarial concepts and standards of practice to the requirements set forth in [N.Y. Ins. Law] Section 7312 [New York Demutualization Statute]" *Pl.'s Response ¶ 97; Prospectus, PIB 2 at A13; Def. Ex. 2.* MetLife asserts that Plaintiffs have not raised a genuine issue of material fact but instead is attempting to "create confusion" between "actuarial formula" and "actuarial concepts" and "standards of practice." *Def.'s Reply at 19.*

It is undisputed that nothing in the PIB stated that the fixed component was determined by a valuation of voting rights. *Def.'s Statement of Material Fact ¶ 98; Exs. 1, 2, 3, 4.* It is also undisputed that nothing in the authoritative actuarial literature, either at the time of mailing of the PIB or today, states or suggests that the fixed component should be determined by a valuation of voting rights. *Def.'s Statement of Material Fact ¶ 99; Ex. 48 ¶¶ 1, 45; Ex. 57 §§ 3.2.1, 3.2.2; Ex. 56 §§ 3.2.1, 3.2.2.*

MetLife asserts that there is no connection between the fixed component and a valuation of policyholders' voting rights. MetLife contends that neither parties' expert witnesses have located any evidence indicating or suggesting that any demutualizing life insurance company has ever stated that it was basing its fixed component on a valuation of voting rights. *Def.'s Statement of Material Fact ¶ 100; Ex. 36 at 180:15–183:12; Ex. 41 at 174:6–12.* Plaintiffs contend that the fixed component, which placed an arbitrary value on the surrender of voting rights at 10 shares ($142.50 at IPO price), was compensation for the right to vote. *Pl.'s Response ¶ 100; MetLife 2003 Rule 56.1 Reply Statement, response to plfs. statements 15–17, 20–21; Ex. 22.*

Compensation for voting rights were a part of MetLife's rationale for the fixed component, but MetLife contends that the fixed component was also intended to ensure that all policyholders received a "sufficient minimum allocation." *Def.'s Reply* ¶ 100; *Ex. 52* ¶ 123; *Ex. 78 at 196:13–197:14; Ex. 66 at 65:22–66:12.* MetLife contends that Plaintiffs have incorrectly implied that the policyholders' consideration was correlated to the value of what they had prior to demutualization. *Def.'s Reply* ¶ 100. MetLife asserts that the Plan's objective was to distribute MetLife shares on a fair and equitable basis. *Def.'s Reply* ¶ 100; *Ex. 90 at 55:19–57:17.* MetLife contends that because the membership interests surrendered pursuant to the Plan were valueless in the absence of the Plan, they did not attempt to put a value on the surrender of those interests. Ex. 90 at 55:19–56:9. *See also In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 184 F.3d 280, 290 (3d Cir.1999). Additionally, MetLife contends that Plaintiffs' claim that the 10–share allocation was "arbitrary" is unsupported by the evidence because the undisputed evidence shows it was a "good-faith business judgment based on demutualization precedent" and no circumstances warranted departure from prior norms. *Def.'s Reply* ¶ 100; *Ex. 33 at 180:21–183:24; Ex. 38 at 209:2–210:8, Ex. 69 at 15:18–17:5; Ex. 47* ¶¶ 4–8; *Ex. 93 at 162:18–164:19; see also Defs.' Opp. to Pls.' 56.1 Statement* ¶ 37.

MetLife asserts that the size of the fixed component, in both dollar amount and percentage of total consideration, is similar to fixed components in other recent demutualizations of U.S. insurance companies. *Def.'s Statement of Material Fact* ¶ 101; *Ex. 47* ¶ 5; *Ex. 33 at 195:8–196:11; Ex. 41 at 193:3–194:16.* Plaintiffs assert that MetLife's position is contradictory: MetLife claims that its fixed component was determined by reference to the fixed com-

ponent in six prior demutualizations but also claims there is no evidence that the fixed component in any other demutualization was compensation for voting rights. Plaintiffs assert that there is no way to determine whether MetLife's fixed component is within the range of other fixed components. *Pl.'s Response* ¶ 101; *MetLife 2003 Rule 56.1 Reply Statement, response to plfs. statement 21; Ex. 22.*

In January 2000, plaintiff Darren Murray and another policyholder, through their counsel Jared B. Stamell, Esq., wrote a letter to the Superintendent ("Murray Letter") alleging that the fixed component was "arbitrary" and was not based on a valuation of voting rights or an actuarial calculation. *Def.'s Statement of Material Fact* ¶ 102; *Ex. 50 at 3–4.* Plaintiffs assert that the letter was inaccurate and incomplete, and contend that the letter was the "initial complaint" in the instant action which was analyzed by the Court in *In re MetLife Demutualization Litig.,* 156 F.Supp.2d 254 (E.D.N.Y.2001); *Pl's Response* ¶ 102.

MetLife contends that the allegations in the Murray Letter concerning the fixed component were based on a reading of the PIB and the Plan. *Def.'s Statement of Material Fact* ¶ 103. Plaintiffs assert that the Murray Letter stated the allegations were based on an investigation conducted by counsel that concluded the Prospectus omitted material information. *Pl.'s Response* ¶ 103; *Def. Ex. 50 at 3–4.* The Murray Letter stated:

> [o]ur understanding of the Plan necessarily is based on the prospectus Met-Life is using to solicit policyholders' acceptance of stock in exchange for their existing policyholder interests. The prospectus consists of, among other things, two booklets entitled "Policyholder Information Booklet Part One"

and "Policyholder Information Booklet Part Two" (collectively, "Prospectus"). *Def.'s Reply ¶ R; Ex. 50.* MetLife contends that since the Murray Letter predates the filing of the complaint in this matter and any discovery, Plaintiffs were able to ascertain the substance of their complaint in this action prior to obtaining any discovery besides the PIB itself. *Def.'s Reply ¶ R.* MetLife asserts that Plaintiffs have failed to raise a genuine issue of material fact.

### *Choice of Demutualization Method*

The Company considered the three forms of statutory conversion listed in Section 7312(d) of the New York Insurance Law that were available to the Company. *Def.'s Statement of Material Fact ¶ 104; Ex. 20 at 202:5–16, 203:21–204:8, 209:25–210:4.* The Company adopted the Plan, which provided for conversion under the method described in § 7312(d)(4) ("Method 4"). *Def.'s Statement of Material Fact ¶ 105; Ex. 7 § 3.2.*

MetLife asserts that Method 4 was chosen because Method 4 permitted a demutualization plan designed to suit their needs. *Def.'s Statement of Material Fact ¶ 106; Ex. 29 at 267:20–268:2; Ex. 20 at 201:19–202:16, 230:6–12.* Although the Plan utilized other mechanisms laid out in § 7312, such as an IPO and a trust, Method 4 gave MetLife more flexibility than other methods in designing the mechanisms used in the Plan. *Def.'s Statement of Material Fact ¶ 107; Ex. 29 at 267:22–268:2; Ex. 34 at 70:17–19, 77:10–18; Ex. 20 at 208:21–209:5.*

The Board, in its resolution adopting the Plan, dated September 28, 1999, stated that reorganization under Method 4 was "the most appropriate method of reorganization under Section 7312(d) for [MetLife] to achieve the purposes set forth in Article 1 of the Plan." *Def.'s Statement of Materi-*

*al Fact ¶ 108; Ex. 8.* The Plan stated that "[t]he Board has determined that this [Method Four] is the most appropriate method of reorganization under Section 7312(d) for the Company to achieve the purposes of the Reorganization described in Article I." *Def.'s Statement of Material Fact ¶ 109; Ex. 7 § 3.2.*

Plaintiffs assert that Method 4 was chosen by MetLife to minimize policyholder consideration and maximize MetLife profits at the policyholders' expense. *Pl.s Response ¶ 106, 107; See, e.g. Chatfield 9/15/98 Memo to Henrikson p. 2; Ex. 38; Weiss 5/19/97 Project Corvette Memo; Ex. 26; Reali 5/17/06 Tr. at 120:18–121:4; Ex. 17; Weiss 5/4/06 Tr. At 31:7–13; Ex. 27.* Plaintiffs dispute of substance of MetLife's statement, alleging that Method 4 was not adopted for the purposes MetLife has stated. *Pl.'s Response ¶ 108; See e.g. Response to Statements 106, 107. Weiss 5/19/97 Project Corvette Memo; Ex. 26; Reali 5/17/06 Tr. At 120:18–121:4; Ex. 17; Weiss 5/4/06 Tr. at 31:7–13; Ex. 27.*

MetLife asserts that none of the evidence Plaintiffs cite support their contentions and the undisputed evidence shows that MetLife was guided by the best interest of the policyholders in adopting the Plan. *Def.'s Reply at 23, ¶ (1). Ex. 81 at 148:24–150:1; see also Exs. 8–11.*

MetLife asserts that neither the method provided in § 7312(d)(1) ("Method 1") nor the method provided in § 7312(d)(2) ("Method 2") would have permitted stock to be held in trust for policyholders' benefit for an indefinite time in the manner provided in the Plan. *Def.'s Statement of Material Fact ¶ 110; Ex. 34 at 63:16–22; 70:1–71:13; 73:2–74:1; Ex. 20 at 203:16–204:14.* Plaintiffs dispute MetLife's contentions and assert that "Method 4" was available for MetLife to seek approval of a demutualization using a Method 2 plan that included a trust. *Pl.'s Response*

¶ 110; *See* New York Ins. Law § 7312(d)(4).

MetLife asserts that "Method 2" and "Method 4" are two separate methods under the statute. It is undisputed that the law permits constructing a Method 4 demutualization in a way that is either similar to one of the other statutory methods or entirely different from all of them. *Def.'s Reply at 23, ¶ (2);* 1988 N.Y. Laws ch. 684, § 1, *reprinted in* N.Y. Ins. Law Ann. § 7312 note (McKinney 2000). MetLife asserts Plaintiffs' dispute is a question of law and not fact. *Id.* Moreover, MetLife contend that Plaintiffs neither assert nor cite evidence of any other hypothetical method of demutualization that would be either desirable or practical. *Def.'s Reply at 23, ¶ (3).*

It is undisputed that Method 2 would have required consideration to include "nontransferable preemptive subscription rights" and a "policyholders' preference account," neither of which was a form of consideration included. *Def.'s Statement of Material Fact ¶ 111; See* N.Y. Ins. Law § 7312(d)(2); Ex. 39 at 79:20–25; 84:13–23. It is also undisputed that MetLife was not eligible to use the method provided in § 7312(d)(3) ("Method 3") because the statute made that method available only to companies having less than $50 million of surplus. *Def.'s Statement of Material Fact ¶ 112;* Ex. 20 at 202:8–10; 320:16–18.

MetLife asserts that the calculation of consideration under Method 2 could result in an amount either lesser or greater than the aggregate value of a demutualizing company's stock. *Def.'s Statement of Material Fact ¶ 113;* Ex. 26 at 193:13–24; Ex. 33 at 112:22–118:8; Ex. 47 ¶ 16. Plaintiffs contend that a Method 2 demutualization would have paid greater consideration than under the Plan as adopted. *Pl.'s Response ¶ 113; MetLife Rule 56.1 statement 114, infra; Wilcox/Harris 8/28/07 Report, pp.*

31–32; *Def. Ex. 44.* MetLife asserts that they were referring to demutualizing companies generally in its statement and it has not been disputed by Plaintiffs because Plaintiffs' assertions reference MetLife and not demutualizing companies generally. *Def.'s Reply at 24, ¶ (1).* Additionally, MetLife contends that Plaintiffs' assertions are "false and immaterial" because the evidence shows that Method 2 could have led to distributing to policyholders less than 100% of the market value of the company or more than 100% of the market value of the company, either of which were undesirable or impossible to achieve. *Def.'s Replay at 24, ¶ (2);* Ex. 33 at 112:16–118:8; Ex. 34 at 140:22–142:3; Ex. 18 at 233:5–234:11; 238:13–239:2; Ex. 47 ¶ 16; *see* Defs.' Mem. at 12–13.

It is undisputed that in MetLife's case, the calculation of consideration for distribution under Method 2 would have been greater than the aggregate value of MetLife, Inc.'s stock at the IPO price. *Def.'s Statement of Material Fact ¶ 114;* Ex. 33 at 112:16–118:8; Ex. 34 at 140:22–142:3; Ex. 18 at 233:8–234:11, 238:13–239:2; Ex. 47 ¶ 16.

*The Policyholder Trust*

Pursuant to the Plan, each eligible policyholder not receiving cash or policy credits, received shares of MetLife, Inc. stock placed in a trust known as the MetLife Policyholder Trust (the "Trust") for the benefit of the policyholder. *Def.'s Statement of Material fact ¶ 115;* Ex. 7 §§ 3.1(c), 5.2(e)(iv), 7.1(a), 7.3(a); Ex. 13 § 2.1. Defendant asserts that the Trust was designed to enable MetLife, Inc. to help control the costs of having approximately 11 million individual stockholders, as would have been the case had the shares been issued directly to the policyholders. *Def.'s Statement of Material Fact ¶ 116;* Ex. 34 at 70:1–16; Ex. 42 at 13:8–19. Plaintiffs assert that, in addition

to controlling costs associated with numerous shareholders, the Trust was also designed to allow MetLife management to control the approximately 63% of MetLife, Inc. stock held in trust. *Pl.'s Response ¶ 116; MetLife 2000 Schedule 13–D, Ex. 15.*

The Policyholder Trust Agreement provided that beneficiaries of stock held in trust would receive the same dividends paid by MetLife, Inc. as shares of common stock. *Def.'s Statement of Material Fact ¶ 117; Ex. 13 §§ 2.1, 7.2.* Aside from certain restrictions of the Purchase and Sale Program, the Policyholder Trust Agreement provided that trust beneficiaries could sell their shares held in trust, beginning on the later of "(i) the termination of any stabilization arrangements and trading restrictions in connection with the IPO or (ii) the closing of all underwriters' overallotment options that had been exercised and the expiration of all unexercised options in connection with the IPO, without paying a commission, mailing charges, registration fees or other administrative costs." *Def.'s Statement of Material Fact ¶ 118; Ex. 13 §§ 5.3(a)-(c).*

Aside from certain restrictions of the Purchase and Sale Program, the Policyholder Trust Agreement provided that beginning one year after the Plan became effective, trust beneficiaries could withdraw their shares in the Trust and receive common stock in exchange, without paying a commission, mailing charges registration fees or administrative costs. *Def.'s Statement of Material Fact ¶ 119; Ex. 13 §§ 5.4(a)-(c).* Pursuant to the Trust Agreement, Trust beneficiaries were able to instruct the Trustee to vote the Trust shares on certain corporate matters known as "Beneficiary Consent Matters." *Def.'s Statement of Material Fact ¶ 120; Ex. 13 § 6.3(c).* Beneficiary Consent Matters included contested Board of Directors elec-

tions; mergers, consolidations and certain similar transactions; and amendment or redemption of rights under MetLife, Inc.'s stockholder rights plan. *Def.'s Statement of Material Fact ¶ 121; Ex. 13 § 6.3(b).* The Trust Agreement provided that the Trustee will vote in accordance with the Board's recommendation on matters other than Beneficiary Consent Matters. *Def.'s Statement of Material Fact ¶ 122; Ex. 13 § 6.3(c)(ii).*

The PIB stated that "As a Trust Beneficiary, you will not have the same rights as the stockholders of the Holding Company." *Def.'s Statement of Material Fact ¶ 123; Ex. 1 at 17.* The PIB also included a chart comparing policyholders' rights, including voting rights, before and after demutualization. *Def.'s Statement of Material Fact ¶ 124; Ex. 1 at 17.* Plaintiffs assert that the chart is incomplete and omits surrender of dividend rights. *Pl.s Response ¶ 124; See,* e.g. *Dunham 3/26/08 Tr. at 204:15–209:9; Ex. 14; Weiss 6/21/99 Board Slides, slide 3; Ex. 32; Harwood 4/6/06 Tr. At 98:9–99:18; 33:24–34:21, 45:19–47:2; Ex. 35.* MetLife responds by asserting that Plaintiffs have added additional statements which are unsupported by the evidence or fail as a matter of law. *Def.'s Reply at 1, ¶ (D).* The chart in the PIB stated:

> Trust Beneficiaries may only vote on certain matters, which will be further limited after the first anniversary of the Plan Effective Date. On all other matters, the Trust Beneficiaries may not vote and the Trustee will vote, assent or consent Trust Shares in accordance with the recommendation or direction given by the Holding Company's board of directors.

*Def.'s Statement of Material Fact ¶ 125; Ex. 1 at 17.* A Decision and Opinion issued by the Superintendent stated materials mailed to policyholders contained information that "were sufficient to allow

policyholders to make an informed decision regarding the voting rights afforded to Trust Beneficiaries under the Plan." *Def.'s Statement of Material Fact ¶ 126; Ex. 52 ¶ 66.* The Decision and Opinion also stated that "(1) it is in the best interest of MetLife and its policyholders to establish the Trust, and (2) the operation of the Trust is fair and equitable to the policyholders of MetLife." *Def.'s Statement of Material Fact ¶ 127; Ex. 52 ¶ 71.* Plaintiffs cite to the Second Amended Complaint and assert that the Prospectus omitted material information preventing policyholders from making an informed decision. *Pl.'s Response ¶ 126, 127.* MetLife correctly argues that Plaintiffs cannot rely on the conclusory allegations in the Second Amended Complaint to raise a genuine issue of material fact. *Def.'s Reply at 1, ¶ (B).*

*Plaintiffs' Interests in MetLife, Inc. Common Stock*

Plaintiff Mary A. DeVito received trust interests in 104 shares of MetLife, Inc. common stock in the demutualization. *Def.'s Statement of Material Fact ¶ 128; Declaration of Michael Hynes dated April 3, 2008 ("Hynes Decl.") ¶ 3.* Through the commission-free program, DeVito sold all her shares of MetLife, Inc. common stock on or about May 9, 2005, and received a check for $4,479.05. *Def.'s Statement of Material Fact ¶ 129; Hynes Decl. ¶ 3.* DeVito has received a total of $135.20 in cash dividends on the MetLife, Inc. common stock held in the Trust on her behalf. *Def.'s Statement of Material Fact ¶ 130; Hynes Decl. ¶ 3.*

Plaintiff Kevin L. Hyms received trust interests in 111 shares of MetLife, Inc. common stock in the demutualization. *Def.'s Statement of Material Fact ¶ 131; Hynes Decl. ¶ 4.* Hyms's shares continue to be held in the Trust on his behalf. *Def.'s Statement of Material Fact ¶ 132;*

*Hynes Decl. ¶ 4.* Hyms has received a total of $349.65 in cash dividends on the MetLife, Inc. common stock held in the Trust on his behalf. *Def.'s Statement of Material Fact ¶ 133; Hynes Decl. ¶ 4.*

Plaintiff Kathy Vanderveur received trust interests in 54 shares of MetLife, Inc. common stock in the demutualization. *Def.'s Statement of Material Fact ¶ 134; Hynes Decl. ¶ 6.* Through the commission-free program Vanderveur sold all of her share of MetLife, Inc. common stock from the Trust on or about May 26, 2004 and received a check for $1,911.17 in exchange for those shares. *Def.'s Statement of Material Fact ¶ 135; Hynes Decl. ¶ 6.* Vanderveur has received a total of $45.36 in cash dividends on the MetLife, Inc. common stock held in the Trust on her behalf. *Def.'s Statement of Material Fact ¶ 136;* Hynes Decl. ¶ 6.

Plaintiff Harry S. Purnell, III received trust interests in 225 shares of MetLife, Inc. common stock in the demutualization. *Def.'s Statement of Material Fact ¶ 137; Hynes Decl. ¶ 7.* On or about August 14, 2001, Purnell withdrew his shares from the Trust. *Def.'s Statement of Material Fact ¶ 138; Hynes Decl. ¶ 7.* Purnell received $45.00 in cash dividends on the MetLife, Inc. common stock held in the Trust on his behalf before it was withdrawn from the Trust. *Def.'s Statement of Material Fact ¶ 139; Hynes Decl. ¶ 7.* As of January 31, 2005, Purnell continued to hold those shares and has not sold them. *Def.'s Statement of Material Fact ¶ 140; Ex. 31 at 59:13–17.* At all times since January 31, 2005, the trading price of MetLife, Inc. stock on the New York Stock Exchange has been $37.29 or higher. *Def.'s Statement of Material Fact ¶ 141; Ex. 60.*

Plaintiff Michael A. Giannattasio received trust interests in 304 shares of MetLife, Inc. common stock on account of

policies issued to him personally (not including policies held as joint tenant with another person) in the demutualization. *Def.'s Statement of Material Fact ¶ 142; Hynes Decl. ¶ 8.* On or about December 17, 2001, Giannattasio sold 100 shares of MetLife, Inc. common stock through the commission-free program and received a check for $3,021.14 in exchange for those shares. *Def.'s Statement of Material Fact ¶ 143; Hynes Decl. ¶ 8.* Giannattasio's other 204 shares continue to be held in the Trust on his behalf. *Def.'s Statement of Material Fact ¶ 144; Hynes Decl. ¶ 8.* Giannattasio has received $682.60 in cash dividends on the MetLife, Inc. common stock held in the Trust on his behalf. *Def.'s Statement of Material Fact ¶ 145; Hynes Decl. ¶ 8.* The price of MetLife, Inc. common stock on the New York Stock Exchange, as of the close of the market on April 3, 2008, was $62.01. *Def.'s Statement of Material Fact ¶ 146; Ex. 60.*

### The Closed Block

As part of the demutualization, the Company established a closed block. *Def.'s Statement of Material Fact ¶ 147; Ex. 33 at 133:12–134:2.* A closed block is an accounting mechanism established to ensure that the reasonable dividend expectations of policyholders who own policies included in the Closed Block continue to be met after demutualization. *Def.'s Statement of Material Fact ¶ 148;* N.Y. Ins. Law § 7312(d)(5); Ex. 58 §§ 2.2, 3.1; Ex. 38 at 171:2–8, 178:5–9; Ex. 39 at 48:3–9; Ex. 29 at 35:3–10; *see also* Ex. 7 Art. II, *Closed Block,* § 8.1(a). The reasonable dividend expectations are based on current payable dividend scales. *Id.* Plaintiffs assert that the closed block established an accounting device used to transfer "as much in profits as possible from policyholders to the company and to limit policyholder dividends." *Pl.'s Response ¶ 148; Weiss 5/25/99 Slide Presentations to Bank Committee, p. 24;* Ex. 33; *Chatfield 9/15/98 Memo to Henrikson, p. 2;* Ex. 38; *Beck 5/25/99 Slide Comments, p. 4;* Ex. 34; *PWC 9/11/98 Slide Presentation;* Ex. 37. MetLife asserts that Plaintiffs have not disputed MetLife's statement but have made additional statements unsupported by the evidence and is contradicted by Plaintiffs' own actuarial experts. *Def.'s Reply at 25, ¶ (2); Ex. 24 at 283:5–11; 287:16–23; 349:2–21.* MetLife contends that the undisputed evidence shows that the closed block was designed to replicate the same profits that MetLife projected had it remained a mutual company. *Def.'s Reply at 25, ¶ (2); Ex. 80 at 398:11–20; Ex. 85 at 150:21–152:12; Ex. 87 at 102:1–103:13; April 1, 2008 Harwood Decl. ¶¶ 3, 4.*

To "develop" the closed block, the Company "worked closely" with the Department and its outside actuarial consultant. *Def.'s Statement of Material Fact ¶ 149; Ex. 23 at 175:25–176:6; Ex. 28 at 162:14–163:14; Ex. 34 at 273:23–274:18.* Plaintiffs dispute the characterizations "worked closely" and "develop" but otherwise do not dispute the substance of MetLife's cited evidence. *Pl.'s Response ¶ 149.* The funding allocated to the Closed Block was deemed "reasonable and sufficient for purposes of Section 7312(d) (5)(B)," by the Superintendent. *Def.'s Statement of Material Fact ¶ 150; Ex. 52 ¶ 144.*

The PIB included information regarding the Closed Block. *Def.'s Statement of Material Fact ¶ 151; Ex. 1 at 44–48, 83–86; Ex. 2 at 16, 31, 34–37, 41, 42, 78–79.* Plaintiffs cite to the Second Amended Complaint and assert that although the Prospectus contained statements about the closed block, the information omits material facts. *Pl.'s Response ¶ 151;* Plaintiffs Second Amended Complaint, Dkt. 120. MetLife correctly argues that Plaintiffs cannot rely on the conclusory allegations of their own complaint to raise a genuine

issue of material fact. *Def.'s Reply at 1.* the PIB stated:

> MetLife will allocate assets to the Closed Block in an amount that it reasonably expects will, together with revenue from the Policies in the Closed Block, be sufficient to pay benefits and certain taxes and expenses of the Closed Block, and provide for the continuation of current dividend scales if the experience underlying such dividend scales continues and for appropriate changes in such scales if the experience changes.

*Def.'s Statement of Material Fact ¶ 152; Ex. 1 at 45.* Plaintiffs dispute the accuracy and the completeness of the above quoted statements as alleged in their complaint. *Pl.'s Response ¶ 152; Plaintiffs Second Amended Complaint, Dkt. 120.* MetLife assert that Plaintiffs do not allege that the dispute is material or and do not cite evidence supporting their contentions. *Def.'s Reply at 1–2.* The PIB stated that "[t]he amount of assets to be allocated to the Closed Block will be based on experience underlying the 1999 dividend scales." *Def.'s Statement of Material Fact ¶ 153; Ex. 1 at 45.*

The PIB also stated that, as of September 30, 1999, the liabilities of the Closed Block would be approximately $39,294 million, and the assets of the closed block would be approximately $31,936 million. *Def.'s Statement of Material Fact ¶ 154; Ex. 2 at 34–35, 79.* Plaintiffs assert that the PIB stated that the assets of the Closed Block as of September 30, 1999 would be $35,826 million (page 34–35 of PIB 2 of the Prospectus), and that the assets of the Closed Block as of September 30, 1999 would be $31,936 million (page 79 of PIB 2 of the Prospectus), a difference in Closed Block assets of approximately $3.9 billion. *Pl.'s Response ¶ 154; PIB 2 at 34–35, 79; Def. Ex. 2.*

MetLife asserts that the difference in the numbers cited by Plaintiffs and MetLife is not a discrepancy. The $31,936 million number on Page 79, by its terms, includes only "invested" assets (consisting of fixed maturity securities, mortgage loans, policy loans, other invested assets, and cash and cash equivalents), while the $35,826 million number on pages 34 and 35 includes not only these invested assets but also adjustments for accrued investment income, premiums and other receivables, deferred policy acquisition costs, and deferred income taxes. (*Compare* Ex. 2, table at 79, *with id.* tables at 34–35, second column of figures in "Assets" section.). *Def.'s Reply at 26, ¶ (1).*

The PIB also stated that "[t]he excess of closed block liabilities over closed block assets at the effective date represents the estimated maximum future contributions from the closed block expected to result from operations attributed to the closed block after income taxes. We will recognize the contributions from the closed block in income over the period the policies and contracts in the closed block remain in force." *Def.'s Statement of Material Fact ¶ 155; Ex. 2 at 41.* Plaintiffs dispute the completeness and accuracy of the above quoted statement and assert that the Prospectus omits the material fact that the excess of liabilities over assets are the present value of profits being transferred from policyholders to MetLife. *Pl.'s Response ¶ 155; Weiss 5/25/99 Slide Presentations to Board Committee, p. 24; Ex. 33; Chatfield 9/25/98 Memo to Henrikson, p. 2; Ex. 38; Beck 5/25/99 Slide Comments, p. 4; Ex. 34; Weiss 5/19/99 Memo to Nagler, pp. 13–14 (Material for 5/25/99 Board Comm. Mtg.); Ex. 40; PWC 9/11/98 Slide Presentation; Ex. 37; MetLife Inc.2000 Annual Report, p. F–22; Ex. 4.*

MetLife asserts that the undisputed evidence shows that the PIB, in detail, ex-

plained that the difference between Closed Block assets and liabilities was equal to the present value of MetLife's likely future profits on Closed Block business. *Def.'s Reply at 26–27;* Ex. 2 at 36–37, 41. Met-Life further asserts that the PIB explained, and Plaintiffs' expert has acknowledged, this difference between assets and liabilities was, in the absence of demutualization, designed to be equal to the amount of profits that MetLife projected it would retain on the closed block. *Def.'s Reply at 27;* Ex. 85 at 348:19–349:8; 150:21–152:12, see also Ex. 87 at 102:1–103:6; April 1, 2008 Harwood Decl. ¶¶ 3, 4. MetLife asserts nothing was "transferred" from policyholders. *Def.'s Reply at 27.*

PricewaterhouseCoopers issued an opinion stating, among other things, that the closed block assets:

> are adequate because they are expected to produce cash flows which, together with anticipated revenues from the Closed Block Business, is reasonably expected to be sufficient to support the Closed Block Business including, but not limited to, provisions for payment of claims and certain expenses and taxes, and to provide for continuation of dividend scales payable in 1999, if the experience underlying such scales continues.

*Def.'s Statement of Material Fact ¶ 156; Ex. 2 at A–14; Ex. 15 at 26:8–11.* MetLife asserts that the closed block was approximately and adequately funded to meet the goals stated in the opinion letter. *Def.'s Statement of Material Fact ¶ 157; Ex. 26 at 180:9–181:10.* Plaintiffs assert that the opinion letter does not state the goal of the Closed Block was to guarantee the present value of MetLife's future profits. *Pl.'s Response ¶ 157; See, e.g., Chatfield 9/25/98 Memo to Henrikson, p. 2, Ex 38.* MetLife asserts that Plaintiffs' contentions are false and unsupported by the evidence and are immaterial. *Def.'s Reply at 27 ¶ (1) and*

(2); Ex. 2 at A–14, Ex. 35 at 349:25–350:4; Ex. 38 at 171:2–8, 178:5–9; Ex. 39 at 48:2–11; Ex. 16 at 424:9–19; Ex. 29 at 35:3–10; Ex. 24 at 138:14–139:15.

In his Opinion and Decision, the Superintendent stated:

> The Department also received an opinion from Daniel J. McCarthy, a consulting actuary with M & R, dated January 24, 2000, certifying, in accordance with Section 7312(h)(3), that the assets allocated to the Closed Block as of January 1, 1999 (including provision for subsequent adjustments) are in an amount which together with anticipated revenue from the Closed Block Business is reasonably expected to be sufficient to support such business including, but not limited to, provisions for the payment of claims, certain expenses and taxes, and to provide for continuation of dividend scales payable in 1999 if the experience underlying such scales continues, and for appropriate adjustment in such scales if the experience changes.

*Def.'s Statement of Material Fact ¶ 158; Ex. 52 ¶ 161.* MetLife asserts that most recent demutualizations of U.S. life insurance companies feature closed blocks with funding based on the assumptions underlying current dividend practices at the time of adoption of the plan of reorganization. *Def.'s Statement of Material Fact ¶ 159;* Ex. 34 at 232:4–6, 255:18–21; Ex. 16 at 350:18–352:10; Ex. 47 ¶ 39. Plaintiffs assert that MetLife's closed block feature guarantees $5.6 billion in profits to the company and the evidence cited by MetLife does not provide a comparison of MetLife's closed block with any other closed block. *Pl.'s Response ¶ 159; Weiss 5/25/99 Slide Presentations to Board Committee, p. 24; Ex. 33; Chatfield 9/25/98 Memo to Henrikson, p. 2; Ex. 38; Beck 5/25/99 Slide Comments, p. 4; Ex. 34; Weiss 5/19/99 Memo to Nagler, pp. 13–14 (Mate-*

rial for 5/25/99 Board Comm. Mtg.); Ex. 40; PWC 9/11/98 Slide Presentation; Ex. 37.

MetLife asserts that the "feature" referred to by Plaintiffs does not refer to the same "feature" in Statement No. 159. *Def.'s Reply at 29, ¶ (1).* Additionally, MetLife asserts that Plaintiffs contentions are false and unsupported by the evidence. *Def.'s Reply at 29, ¶ (1).* MetLife asserts that the undisputed evidence shows that the closed block is designed to prevent MetLife from ever earning more on the Closed Block policies than the $5.6 billion in profits that it projected it would have retained had it remained a mutual company. *Def.'s Reply at 29–30; Ex. 80 at 331:3–332:3, 398:11–20; Ex. 85 at 150:21–152:12.* The uncontradicted evidence also shows that the Closed Block does not guarantee that MetLife will not earn less, *Ex. 91 at 264:24–266:6,* and the Closed Block was "designed to protect policyholders from ever having to worry that MetLife, as a stock company, would reduce their dividends to increase its profits." *Def.'s Reply at 30; Ex. 91 225:2–22; Ex. 80 at 395:23–396:11.*

A closed block with funding based on the assumptions underlying current dividend practices at the time of adoption of the plan and reorganization is consistent with authoritative actuarial literature and Section 7312(d)(5) of the New York Insurance Law. *Def.'s Statement of Material Fact ¶ 160, ¶ 161; Ex. 58 § 3; Ex. 47 ¶¶ 19, 43; Ex. 48 ¶ 41; N.Y. Ins. Law § 7312(d)(5).* Plaintiffs contend that while actuarial literature does conclude that a closed block should replicate actual dividend practices, it does not succeed in doing that since a closed block reduces future dividends. *Pl.'s Response ¶ 160; Carroll June 1997 Article re Closed Blocks; Ex. 45; Kamen 9/30/07 Draft Testimony, Q & A, pp. 3–4; Ex. 5.* Plaintiffs also assert that a closed block is not required in a Method 4 demutualization. *Pl.'s Response ¶ 161; See New York Ins. Law § 7312(d)(4),(5); Beck Opinion; p. A–14; Def. Ex. 2.* MetLife asserts that Plaintiffs' contentions that the closed block reduces future dividends is unsupported by the evidence. *Def.'s Reply at 30, ¶ (2).* Additionally, MetLife does not dispute that a closed block is not required by statute in a Method 4 demutualization. *Id. at ¶ (3).*

MetLife assert that the 1999 dividends scale, used to calculate the closed block, was consistent with the Company's practice in prior years. *Def.'s Statement of Material Fact ¶ 162; Declaration of Michael Harwood dated April 1, 2008 ("Harwood Decl.") ¶ 3; Ex. 16 at 302:11–304:15.* Plaintiffs contest MetLife's assertions, stating that MetLife cut its dividend scales from 1992 to 1998. *Pl.'s Response ¶ 162; MetLife 1994, 1996 and 1997 Dividend Memos, Exs. 50, 51 and 52; MetLife 1/16/92 and 11/10/92 Field Force Memos, Exs. 53 and 54.* MetLife asserts that Plaintiffs has conflate dividend scales with dividend "practices." *Def.'s Reply at 30–31, ¶ (4).* The Company's dividend practices, which by definition anticipate yearly changes in dividend scales, Ex. 16 at 302:11–304:15; April 1,2008 Harwood Decl. ¶ 3., underlying the 1999 dividend scales were consistent with the Company's practice in prior years. *Def.'s Reply at 30–31, ¶ (4).*

MetLife asserts that the Company had no plans to alter its dividend practices to increase surplus distributed to policyholders had it remained a mutual company. *Def.'s Statement of Material Fact ¶ 163; Harwood Decl. ¶ 4.* Plaintiffs claim, however, that had the Company continued as mutual company using existing dividend practices, any increase in profits would have been distributed to policyholders instead of going to the Company's profits.

*Pl.'s Response ¶ 163; Kamen 9/30/97 Draft Testimony; Q & A, pp. 3–4, Ex. 5; Wilcox/Harris 5/13/08 Declaration, ¶¶ 3–12; MetLife 2/13/96 Actuarial Statement of Opinion; Ex. 47; MetLife 10/21/98 Actuarial Statement of Opinion, Ex. 48: MetLife 2/10/04 Actuarial Statement of Opinion; Ex. 49.* MetLife asserts that Plaintiffs' contentions are based on conjecture and misrepresentation of the methodology used to calculate dividend payments by MetLife and other insurance companies. *Def.'s Reply at 31; Ex. 48 ¶¶ 17–24; Ex. 24 at 125:6–127:24; April 1, 2008 Harwood Decl. ¶¶ 3–4; see also Defs.' Mem. at 23–24.*

MetLife asserts that it is impossible to predict how much would have paid out in policyholder dividends over the life of policies now in the closed block had the Company remained a mutual company and the closed block not been established in view of possible changes in future experience. *Def.'s Statement of Material Fact ¶ 164; Ex. 48 ¶¶ 1, 18.* However, Plaintiffs assert that the present value of future dividends can be calculated. *Pl.'s Response ¶ 164; Wilcox/Harris 5/13/08 Declaration, ¶¶ 5–12; MetLife Actuarial Contribution Memorandum; Def. Ex. 14.* MetLife contend that Plaintiffs have misstated the evidence. *Def.'s Reply at 31.* The present value of future dividends, MetLife asserts, can only be projected if one assumes that (i) there will be no changes in mortality, interest rates, or other relevant experience in the future, and (ii) dividend practices will remain unchanged. *Ex. 48 ¶¶ 17–23; Ex. 24 at 125:5–127:24; 143:12–144:8, 257:20–258:22.* Additionally, Plaintiffs do not dispute that relevant experience will almost certainly change and that there is no guarantee as to what dividend practices future boards of directors will or will not adopt. *Def.'s Reply at 31, ¶ (6); Ex. 48 ¶¶ 18–19; Ex. 24 at 143:12–144:8; Ex. 92 at 478:5–18.*

## Plaintiffs' Claims Generally

MetLife asserts that the PIB did not misrepresent any material facts or omit any material facts necessary to make the representations "not misleading" about the allocation and amount of consideration, the funding and operation of the Closed Block and the operation of the trust. *Def.'s Statement of Material Fact ¶ 165.* Plaintiffs assert that the Prospectus omits material facts. *Pl.'s Response ¶ 165.* MetLife asserts that Plaintiffs broad and unspecific references to testimony and documents fails to comply with Local Rule 56.1. *Def.'s Reply at 34.*

MetLife asserts that class members have suffered no loss, damage or injury in connection with the demutualization. *Def.'s Statement of Material Fact ¶ 166.* Plaintiffs assert that all class members suffered loss, damage and injury. *Pl.'s Response ¶ 166.* MetLife contends that the materials cited by Plaintiffs is not evidence but is legal argument or inadmissible speculation of Plaintiffs' experts that lack support in the record. *Def.'s Reply at 34.*

In the first of such decisions, *In re: MetLife Demutualization Litig.,* 156 F.Supp.2d 254 this Court summarized Plaintiffs' claims thus: Plaintiffs claimed that the material information on several matters was omitted from the PIB concerning:

> (i) the value of those rights; (ii) the value of the rights of a shareholder in a Delaware corporation (without the trust) and the costs associated with excercising those rights; (iii) the value of those rights as beneficiaries of the Trust and the costs associated with that organizational structure.

They alleged that the PIB was false and misleading because it did not contain facts showing that the distribution of shares of stock to policyholders was unfair. The

distribution of stock was allegedly unfair because it overvalued the right to vote: as alleged in the complaint, the cumulative value of the ten shares distributed to all policyholders in exchange for their membership interests was equal to approximately sixteen percent (16%) of MetLife, Co's $13.6 billion surplus, which, according to Plaintiffs was converted into equity upon demutualization. Plaintiffs maintain that as participating policyholders they were entitled to a greater amount of stock issued in exchange for membership interests because only they had statutory interests in the surplus. In the Plaintiffs' words, the PIB violated the Securities Act because "it is false and misleading in that it omits any discussion about the value of the equity allocated to voting rights of participating and nonparticipating policyholders, or that the value ascribed to voting rights is materially greater than the actual value of those rights." (Gold Compl. 34)

## DISCUSSION

### Standard for Summary Judgment

A motion for summary judgment may not be granted unless the Court determines that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Federal Rule of Civil Procedure 56(c)). The Court must examine the evidence in the light most favorable to the non-moving party's favor. *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003). "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the [specific] pleadings, and 'designating specific facts showing that there is a genuine issue for trial.'" *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470

(2d Cir.2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Finally, "the judge's role in reviewing a motion for summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 242, 106 S.Ct. 2505.

■ To establish a claim under Section 12(a)(2), Plaintiffs must prove, among other things, that (1) defendants "offer[ed] or s[old] a security" (2) "by means of a prospectus" (3) "which include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77*l* (a)(2); see, e.g., *Garber v. Legg Mason, Inc.,* 537 F.Supp.2d 597, 610 (S.D.N.Y. 2008). The standard for establishing materiality of an alleged omission or misrepresentation is the same under Section 12(a)(2) and Rule 10(b)(5). *Geiger v. Solomon–Page Group, Ltd.,* 933 F.Supp. 1180, 1184 (S.D.N.Y.1996). Plaintiffs must also show that each purchaser "had no knowledge of the untruth or omission." *Mayer v. Oil Field Sys. Corp.,* 803 F.2d 749, 755 (2d Cir.1986); see 15 U.S.C. § 77*l* (a)(2); *Healey v. Chelsea Res., Ltd.,* 947 F.2d 611, 617 (2d Cir.1991).

■ The standard for obtaining summary judgment on materiality claims is extraordinarily high, and the Court may decide on the question of materiality at summary judgment in limited circumstances. It is a question normally reserved for the trier of fact. Only if the established omissions are so obviously important or unimportant to an investor "that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved as a matter of law by summary judgment.

264

*TSC Indus., Inc. v. Northway, Inc.* 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). In the case of an alleged omission, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the "total mix" of information made available. *Id.* at 499, 96 S.Ct. 2126. In such questions of materiality, the underlying objective facts are "merely the starting point for the ultimate question of materiality." *Id.* Because of the "delicate assessments" involved in determining what a reasonable shareholder would infer from the underlying facts, this assessment is normally one for the trier of fact. *Id.* Also, "[t]he determination of materiality is to be made upon all the facts as of the time of the transaction, and not upon a 20-20 hindsight view long after the event." *Spielman v. General Host Corp.*, 402 F.Supp. 190, 194 (S.D.N.Y.1975)

*MetLife's Arguments on Alleged Omissions*

MetLife argues that based upon the uncontroverted facts, the Plaintiffs cannot establish that the PIB contained any misrepresentations or misleading omissions of material facts. They note that "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.1993). Further, they note that in the absence of a specific duty to disclose information, omission are actionable only "when the omitted information is required to make other information presented not materially false or misleading." *Malhotra v. Equitable Life Assur. Soc'y*, 364 F.Supp.2d 299, 307 (E.D.N.Y.2005). The Court is still required to resolve any doubt about the materiality of alleged omissions in favor of the Plaintiffs, despite MetLife's strong factual support for its argument

that it conducted its demutualization properly, and the fact that Plaintiffs' theories appear increasingly desperate in light of the factual record accumulated so far. Plaintiffs have identified four main issues on which they claim MetLife omitted material information: the 10-share fixed component, the actuarial contributions of policyholders, MetLife's choice of method to demutualize, and the Closed Block and dividends paid from surplus.

MetLife marshals a convincing body of evidence that its demutualization was conducted in accordance with standard actuarial practices and in compliance with New York insurance law. The demutualization was given the approval of the Superintendent of the New York State Insurance Department after an appropriate review. The fixed component was indisputably based upon precedent from prior life insurance company demutualizations. From the available facts, it also appears that the demutualization process has been an overall boon to policyholders, at least insofar as those who took stock have seen the price of the stock rise appreciably and have also kept the benefits of their life insurance policies. There is also no dispute that the method of demutualization was one specifically approved by the New York law, indeed, it was one of only a few methods of demutualization permitted. Plaintiffs' argument that the fixed component created a windfall to non-participating policyholders remains unsupported by any facts, and is still rooted in the assumption that in defiance of all demutualization precedent, MetLife should have given nothing to those policyholders. Indeed, much of Plaintiffs' opposition is devoted to conclusory allegations regarding the demutualization.

■ Nonetheless, the disputes over the general propriety of the demutualization are mostly secondary to the issue relevant

at summary judgment. Plaintiffs have alleged that material information was omitted from the PIB on four main subjects. At summary judgment in cases involving alleged omissions of material facts under the securities laws, the Court must address the "delicate" question of whether any reasonable mind could differ on the question of materiality, which is normally reserved for the trier of fact. "Only when the omissions are so obviously important or unimportant to a reasonable investor that 'reasonable minds cannot differ on the question of materiality' is the issue appropriately resolved as a matter of law by summary judgment." *Alliance Pharm. Corp. Sec. Litig.*, 279 F.Supp.2d 171, 187 (S.D.N.Y.2003) citing *TSC*, 426 U.S. at 450, 96 S.Ct. 2126. The Court in *Alliance* struggled with applying the *TSC* standard in a similarly difficult situation. In that case, questionably material information was omitted from a registration statement, but the Court found that plaintiff's claims survived summary judgment, even as it expressed doubt as to their success at trial: "Plaintiffs will have their day in court, but they obviously face a much greater burden in convincing a trier of fact of defendants' liability than they have overcome here by defeating defendants' motion for summary judgment." *Id.* at 191. In this spirit, the Court finds that with regard to the alleged omissions at issue, Plaintiffs have overcome the burden of surviving a motion for summary judgment because some of these alleged omissions are not so obviously unimportant that reasonable minds could not differ as to their materiality.

### The Ten Share Fixed Component

The Court will briefly summarize facts related to the 10–share fixed component. Pursuant to the demutualization plan, life insurance policyholders maintained their existing insurance policies, and kept their existing benefits, cash values and dividend eligibility. Policyholders received all of the stock from the initial public offering, or in a small number of instances, cash or policy credit. As part of the demutualization, policyholders gave up their membership interests in the mutual corporation, which included the right to vote on matters submitted to them and the right to receive a portion of the surplus in the event that MetLife was liquidated. The Court has already determined that the allocation of stock in this matter constitutes a purchase or sale under the federal securities laws.

The amount of stock allocated to an individual policyholder depended in part on whether they were a participating policyholder or a non-participating policyholder. A participating policyholder was one who had contributed positively to the company's surplus and had an interest in that surplus; a non-participating policyholder was one who had not contributed positively to MetLife's surplus, and therefore did not have a statutory interest in the surplus. Both non-participating policyholders and participating policyholders had the right to vote on matters submitted to policyholders, such as elections of directors. *Pls.' Statement of Material Fact at ¶ 9–12.*

MetLife's allocation of stock contained two components: a fixed component and a variable component. The fixed component granted every eligible policyholder a minimum of 10 shares, and was allocated to both participating and non-participating policyholders. The aggregate variable component was the total remaining shares left after the allocation of the fixed component. Under the variable component, contributing policyholders were allocated additional shares based upon an actuarial formula developed in consultation with an actuarial advisor and the Department of Insurance. The vast majority of stock was allocated to contributing policyholders,

with non-participating policyholders receiving only about $340 million in compensation out of the $9.6 billion paid in total.

Plaintiffs are seeking summary judgment on their claim that the PIB was false and misleading because it omitted facts related to the 10–share fixed component of the compensation. They contend the 2.42 million non-contributing policyholders received a "windfall" at the expense of participating policyholders. They claim that MetLife failed to disclose material information regarding the 10–share fixed component to non-participating shareholders.

MetLife argues that PIB did not contain any material omissions with regard to the 10–share fixed component of the compensation. As discussed above, the 10–share fixed component was paid to both participating and non-participating policyholders. Plaintiffs claim that MetLife omitted information sufficient to show that the fixed component was "not fair and was not based on actuarial concepts" and that the fixed component was paid "only to compensate policyholders for surrendering the right to vote." *Compl.* ¶¶ 66–67. Plaintiffs also claim that this Court has already found that this information was a material omission. This is not entirely true. The Court merely allowed the claim to proceed at the motion to dismiss stage without hearing evidence on the subject. The Court did find that it could not say as a matter of law that the defendants omissions of a "further explication of the facts behind the choice of a ten share fixed component is so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of its importance." *In re MetLife Demut. Litig.*, 156 F.Supp.2d at 268. Even in light of the newly submitted evidence, this Court is still unable to determine this issue as a matter of law.

Plaintiffs contend that the Prospectus omitted the following material facts regarding the 10–share fixed component: (1) The fixed component was compensation for the right to vote; (2) MetLife, and its consultants and advisors, never valued the right to vote; (3) MetLife determined the number of shares to allocate as the fixed component based on a range of allocation percentages from six prior demutualizations; (4) MetLife applied no valuation or method to determine the 10–share fixed component, other than referring to a range of allocation percentages from six prior demutualizations; (5) MetLife asserts the right to vote had no value; and (6) MetLife allocated 24.2 million shares as the fixed component to Non–Contributing Policyholders, and thereby reduced compensation to Class members by 24.2 million shares. Plaintiffs conclude that the fixed component was therefore a "windfall" to the non-participating shareholders because the right to vote had no value. An omission is deemed material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The Court will analyze each of the alleged omissions related to the 10–share fixed component.

a. *Alleged failure to disclose fixed component was compensation for voting rights*

■ Plaintiffs state that MetLife failed to disclose in the Prospectus that the fixed component was compensation for the right to vote. *Pls.' Statement of Material Fact at* ¶ 25. Plaintiffs point to a letter from MetLife's chief actuary to the CFO and Vice Chairman in support of their allegations: "The fixed component ... is compensation for surrendering the right to

vote." *Pls.' Reply Mem.* at 3; *8/24/99 Board Materials (Chief Actuary Weiss 8/18/99 Memo to Vice Chairman and CFO Nagler, p. 1), Bates 71678, Stamell Aff. Ex. 10.* Plaintiffs argue that MetLife has effectively admitted that the fixed component was compensation for the right to vote.[6] *Pls.' Reply Mem* at 12.

MetLife argues that all eligible policyholders received the same fixed consideration, and that they did not separately exchange different parts of their membership interests for different components of consideration. MetLife asserts that nothing in the law, actuarial literature, or demutualization precedent suggests that a valuation of voting rights should or could be used to determine the size of the fixed component. *Def.'s Ex.* 56 §§ 3.1–3.1.1, 3.2–3.2.2; Ex. 57 §§ 3.1–3.1.1, 3.2–3.2.2; *Ex.* 48 ¶¶ 1, 45. Plaintiffs' experts acknowledged that they could point to no such obligation. *Def's Ex.* 78 at 174:6–175:17, 192:19–24; Ex. 75 at 51:15–52:8, 226:2–9. According to undisputed evidence submitted by MetLife, every life insurance company demutualization since 1986 has included a fixed component, and no company has based the size of the fixed component on an attempted valuation of voting rights. *Def's Ex.* 47 ¶ 4; Ex. 36 at 180:12–183:12. Also, it is undisputed that the PIB stated the fixed component was consideration for policyholders' relinquishment of their "membership interests," which included the right to vote. Determining the type of inference drawn from these statements, and its effect on policyholders' decision-making is precisely the type of "delicate assessment" that is "peculiarly" reserved for the finder of fact.

*See TSC Industries,* 426 U.S. at 450, 96 S.Ct. 2126.

b. *Alleged failure to disclose that MetLife never valued the right to vote*

Plaintiffs' second alleged omission is that MetLife and its consultants and advisors never valued the right to vote. *Pls.' Statement of Material Fact at ¶ 32–33.* MetLife does not dispute that it never valued the voting rights of any individual policyholder, nor did it value the collective right to vote. Plaintiffs' argument as to the materiality of this omission is not entirely clear from its very short summary judgment motion, but it is connected to their assertion that the fixed component was compensation for the right to vote. Plaintiffs begin with the assertion that if MetLife had disclosed all six of the of the relevant facts, "the Class members would have known they were losing 24.2 million shares paid to Non–Contributing Policyholders solely for the right to vote—a right that MetLife never valued and asserts had no value." *Pls.' Mot. For Summ.* J. at 6.

c. *Alleged failure to disclose how fixed component was determined*

█ The third and fourth alleged omissions are the same. The third alleged omission is that "MetLife did not disclose that it determined the 10–share component solely by reference to allocation percentages in six prior demutualizations." *Pls.' Mot. Summ. J.* at 6; *Pls.' Statement of Material Fact at ¶ 36–37.* The fourth alleged omission is substantively similar, but is phrased slightly differently: "MetLife did not apply any valuation or method to determine the 10–share fixed component,

---

**6.** MetLife's Response to Plaintiffs' Rule 56.1 statement stated that "[a]ll Eligible Policyholders were given consideration, including a fixed component … for all their Policyholders' membership interests … As a matter of law, these Policyholder Membership Interests included the right to vote."

other than referring to allocation percentages in six prior demutualizations." *Pls.' Mot. Summ.* J. at 6. MetLife does not dispute that the fixed component was based in part upon precedent in prior demutualizations that had taken place in New York. MetLife points out that The New York Insurance Department advised MetLife that the fixed allocation should be based on precedent in previous demutualizations that had taken place in New York. *Ex.* 33 at 180:21–183:24; *Ex.* 38 at 209:2–210:8; *Ex.* 69 at 15:18–17:4.

MetLife provides a substantial body of evidence showing that their determination of the fixed component based upon precedent from other life insurance demutualizations was proper. Again, Plaintiffs' assertion relies on the assumption that the fixed component was compensation for relinquishing the right to vote; an issue that is contested, with both parties citing to evidence supporting their respective positions. The PIB made clear that each policyholder is entitled to the fixed compensation of 10 shares. It is also obvious from reading the PIB that there is no representation regarding how the 10 share fixed compensation was determined. It may not be said that further explanation of factors behind the 10–share allocation of the fixed component is or is not so obviously important to a reasonable investor that its omission did or did not significantly alter the "total mix" of information; reasonable minds can disagree on its materiality.

d. *Alleged failure to disclose MetLife's assertion that voting rights had no value*

Plaintiffs' fifth alleged omission is that "MetLife asserts that the right to vote had no value." *Pls.' Mot. Summ.* J. at 4. This is not a material fact, it is an assertion regarding MetLife's position in the instant litigation. Plaintiffs' only evidence on this point is their characterization of statements made by counsel for MetLife in relation to the instant action. *Pls.' Statement of Material Fact* at ¶ 34. The statements, taken out of context from a reply memorandum, merely assert that policyholders' membership interests did not necessarily equate to the value of the stock they received. MetLife 11/20/00 *Reply Mem. on Mot. to Dismiss* (Dkt. 24, filed 1/12/01) at 7. These are not binding judicial admissions, they are legal arguments related to MetLife's theory of loss causation. This kind of conclusory allegation cannot be given any weight as evidence on summary judgment, and therefore the Court will not consider the potential materiality of this alleged omission.

e. *Alleged failure to disclose distribution of fixed component to all policyholders*

 Plaintiffs' sixth alleged omission is that MetLife did not disclose the fact that it allocated 24.2 million shares as the fixed component to non-contributing policyholders, thereby reducing Plaintiffs' compensation. It is undisputed that this allegation is not plead in the Second Amended Complaint, and Plaintiffs only state that MetLife was on notice of this claim based upon statements made in their initial complaint. *Pls.' Mot. for Summ.* J. at 5. A defendant is not "on notice" of claims which are abandoned in subsequent amended complaints. Prior pleadings are deemed withdrawn upon filing of amended pleadings unless specifically referred to in amended pleading, thus, when incorporating other documents, an amended pleading must make clear which statements it intends to incorporate from other documents. *Levitch v. Columbia Broadcasting System, Inc.,* 94 F.R.D. 292, 1982–2 CCH Trade Cases P 64972, aff'd (1983, C.A.2 N.Y.) 697 F.2d 495, 1982–83 CCH Trade Cases P 65153. Plaintiffs are not entitled

to amend their complaint through statements made in motion papers. *See Wright v. Ernst & Young, LLP,* 152 F.3d 169, 178 (2d Cir.1998). Therefore, the Court will not address this claim because Plaintiffs have already abandoned this theory and cannot revive it after discovery is closed.

### The Remainder of Plaintiffs' Claims

 MetLife challenges Plaintiffs' claims related to actuarial contributions and the projected IPO price of MetLife stock. *MSJ* at 10. Plaintiffs contend that MetLife withheld information about the amount of actuarial contributions made by participating policyholders, and that this omission in turn made it impossible for policyholders to evaluate what they were giving up in the demutualization in comparison to the projected IPO price. *Pl.'s Opp.* at 7. Plaintiffs claim that the amount of contributions (either individually or in the aggregate) to MetLife's surplus were not disclosed in the PIB because MetLife wanted to give the appearance of a "something for nothing" deal, when in reality, policyholders would be given stock less than the value of their contributions to the surplus. *Id.* Plaintiffs note that MetLife's Chief Actuary testified that such facts were omitted to avoid opening a "pandora's box" of questions from policyholders. *Id.* Plaintiffs also contend that the projected IPO price was false.

MetLife argues that the PIB accurately disclosed that the policyholder's shares would be valued by the market, and that the amount of policy or cash would be determined by an IPO. They further argue that the PIB clearly stated that 100% of "equity" would be allocated to policyholders. Plaintiffs claim that policyholders were misled into believing that they were being given the "value" of the entire company. MetLife argues that it had no duty to compare the proposed transaction with

a hypothetical "single buyer" transaction, and that the PIB does not suggest that policyholders would receive the value of such a transaction from the IPO. Whatever the potential for mistaking equity for value, as a preliminary matter, the Court may not say as a matter of law that reasonable minds could not differ as to the materiality of the omitted actuarial information, specifically the value of contributions to surplus.

For the same reasons, Plaintiffs survive summary judgment on the omission of information related to the closed block. MetLife has offered convincing evidence that the operation of the closed block was consistent with standard practice. *MSJ* at 15–16. MetLife also points out that the Superintendent of the Insurance Department determined that the closed block was adequately funded for its intended purpose. *Def.'s Ex.* 52. The apparent propriety of the closed block is not enough though to insulate the transaction from all doubts as to the completeness of information provided about that aspect of the demutualization in the PIB. Plaintiffs point to a memo from PWC which purportedly shows that an additional $1 billion allocation to the closed block would yield an additional $1.5 billion to closed block policyholders, as well as a memorandum from MetLife's Chief Actuary conveying this information to the board of directors. *Pl.'s Exs.* 39, 40. Plaintiffs contend that it was MetLife's intention to reduce the amount of equity in the closed block to the benefit of the company, and to fund the closed block with as few assets as possible. This may not have been MetLife's intention, but Plaintiffs have introduced enough evidence to raise issues of material fact on this question.

 MetLife also argues that there are no material omissions regarding its choice of which demutualization method to use.

As discussed above, MetLife chose "Method 4" out of three statutorily authorized demutualization methods. MetLife stated in the PIB that it chose this method because it was the "most appropriate method." As part of its explanation of why it chose this method, MetLife also stated that it considered "Method 2" for demutualization, but that it determined Method 2 did not "provide for Eligible Policyholders to receive consideration in the form and manner described in the Plan." Method 2 is one of the other statutorily authorized demutualization methods, and MetLife states that this method has not been used in any demutualization in New York. Plaintiffs focus on the analysis MetLife used in determining not to use Method 2. MetLife's Chief Actuary apparently made back of the envelope type calculations, described by her as "extremely crude" estimates. Pl.'s Ex. 26. Plaintiffs allege that MetLife ruled out Method 2 based upon these estimates because this estimate showed that it would pay nearly twice as much in shareholder equity.

Plaintiffs further claim that MetLife was required under *In re Time Warner Sec. Lit.*, 9 F.3d 259 (2d Cir.1993) to disclose plans it considered other than the plan proposed in the PIB. This is an overstatement. *In re Time Warner* states that when a corporation is "pursuing a specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration." *Id.* at 268. There is clearly no absolute requirement to disclose any business plan considered alongside the disclosed plan, particularly where the facts show that consideration of the alternative plan was quickly discarded.

The question of whether MetLife had other reasons than the disclosed reason for not pursuing a Method 2 demutualization is more nebulous. The reason stated in the PIB is somewhat vague, and Plaintiffs' allegations of the "real" reasons for not pursuing Method 2 are not well substantiated by the factual record. MetLife provides convincing evidence that Method 2 would not have worked and would have been untenable for a variety of reasons. However, the undisputed evidence could possibly lead a reasonable person to question the weight given to the analysis by the Chief Actuary, and raises the question of the materiality of the omission of further information related to Method 2. J.P. Morgan said that a man always has two reasons for doing something, "a good reason, and the real reason." Plaintiffs have not established that MetLife's real reason for not pursuing Method 2 was a desire to reduce the amount of equity in the IPO, but they have established a sufficient issue of fact to escape summary judgment. Under the reasonable person standard which this Court must apply, we cannot say that minds could not differ on the materiality of omitted information with regard to the choice of demutualization method.

*Loss and Damages*

██ MetLife also seeks summary judgment on all of Plaintiffs' claims because, they argue, Plaintiffs cannot prove damages under either Rule 10(b)(5) or Section 12(a)(2). As demonstrated by the competing expert opinions and disputed facts described above, the Court cannot say as a matter of law that Plaintiffs will not be able to demonstrate any loss or damages whatsoever should they prove that the PIB contained material omissions related to the 10–share fixed component. However, it is certain that Section 12(a)(2) only provides for rescission or rescissory damages except in limited circumstances which do not apply here.

Under Section 12(a)(2) Plaintiffs must show that they "suffered compensable damages" *Commercial Union Assurance Co. plc v. Milken,* 17 F.3d 608, 615 (2d Cir.1994); accord, e.g., *In re Daou Sys., Inc.,* 411 F.3d 1006, 1029 (9th Cir. 2005). Damages under § 12(a)(2) are measured by the difference between (i) the amount of consideration the plaintiff originally paid for the security, plus prejudgment interest, less (ii) the amount for which the plaintiff sold the stock, together with any income the plaintiff received on the security. *Pinter v. Dahl,* 486 U.S. 622, 641 n. 18, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988); *Randall v. Loftsgaarden,* 478 U.S. 647, 655–56, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986). If the plaintiff no longer owns the security, the remedy is rescission. 15 U.S.C. § 77l (a); *see Randall,* 478 U.S. at 655, 106 S.Ct. 3143; Louis Loss & Joel Seligman, *Securities Regulation* § 11 C.2 (3d ed. 2006) ("It seems clear in the statutory context that, when the plaintiff in Section 12 no longer owns the security, damages are to be measured so as to result in the substantial equivalent of rescission—namely, the difference between the purchase price and the plaintiff's resale price, plus interest, and less any income or return of capital (with interest) that the plaintiff received on the security.")

MetLife points out that the stock price has generally increased greatly since the demutualization. This may be so, but in the unstable financial world as it exists, this may no longer be the case. As difficult as it is to fix a value on the amount paid for stock when the stock at issue was not paid for in cash, it is unlikely that the value would be higher than $25.54 per share—the amount which Plaintiffs' claim represented value of the company at the relevant time. This number assumes the full $18 billion value that Plaintiffs' experts have assigned to the company at the time of demutualization, which would then be the absolute maximum "value" given in exchange for all outstanding shares at the time of demutualization. Plaintiffs' proposal that rescission would be based the current value of the company is simply unfounded and is rejected.

Plaintiffs argue that the class members surrendered 100% of the value of the Company for 86% of MetLife, Inc. They argue that therefore, no increase in the price of the stock can make rescissory damages futile because Plaintiffs will always have 14% less stock than they should. Plaintiffs' argument means that even if MetLife stock shot up to $1000 per share, and a member of the class sold it at that price, he would still be entitled to further rescissory damages. This is not so and would render Section 12(a)(2) meaningless. There are currently material disputes as to the value of what class members gave in exchange for their stock, and the Court therefore cannot decide what this exact value is at summary judgment. But the maximum amount possible per share for purposes of rescission or damages under Section 12(a)(2) would likely correlate to Plaintiffs' own high end estimate of the value of the Company.

## CONCLUSION

For the foregoing reasons, MetLife's motion for summary judgment is DENIED. Plaintiffs' motion for summary judgment is DENIED.

SO ORDERED.